# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

| | |
|---|---|
| LLT MANAGEMENT LLC, <br><br>                 Plaintiff, <br><br>        -v- <br><br> DR. THERESA SWAIN EMORY, DR. RICHARD LAWRENCE KRADIN, AND DR. JOHN COULTER MADDOX, <br><br>                Defendants. | Civil Action No. 4:24-cv-75 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................... 1

PARTIES................................................................................................................................... 3

JURISDICTION ....................................................................................................................... 5

FACTS ...................................................................................................................................... 5

I.      Drs. Emory, Kradin, and Maddox: Plaintiffs' Paid Expert Witnesses. ............................ 5

II.     The Authors Published Disparaging Statements In Their Article. ..................................... 7

III.    The Authors Republished Their Deceitful And Disparaging Claims .............................. 10

IV.     The Authors Knew Their Statements Were False Or Recklessly Ignored Available
        Information Demonstrating Their Falsity When Made. ................................................... 16

        A.     Case #72 ................................................................................................................ 17

        B.     Case #67 ................................................................................................................ 21

        C.     Case #65 ................................................................................................................ 22

        D.     Case #75 ................................................................................................................ 24

        E.     Case #8 .................................................................................................................. 25

        F.     Case #33 ................................................................................................................ 27

V.      The Authors And Plaintiffs' Counsel Concealed The Falsity Of Their Statements. ........ 28

VI.     LLT Was Gravely Harmed By The Authors' False Statements........................................ 30

CAUSES OF ACTION ........................................................................................................... 31

        Count I: Injurious Falsehood / Product Disparagement ...................................................... 31

        Count II: Fraud .................................................................................................................... 36

        Count III: Violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a) ................................... 37

PRAYER FOR RELIEF ......................................................................................................... 39

DEMAND FOR JURY TRIAL............................................................................................... 39

**INTRODUCTION**

1.      This is an action to recover for the knowing disparagement of Johnson's Baby Powder and Shower to Shower by Drs. Theresa Emory, Richard Kradin, and John Maddox.

2.      LLT previously filed a complaint against Dr. Jaqueline Moline, who had widely proclaimed that she had demonstrated that cosmetic talcum powder products—including Johnson's Baby Powder and Shower to Shower—can cause mesothelioma by her published paper of 33 mesothelioma patients who she claimed used talc powder and had no other potential exposures to asbestos. That claim was false, as was laid bare in September 2022 by a federal judge in the District Court for the Middle District of North Carolina. The federal court rejected the plaintiff's request to keep its falsity findings under seal, reasoning that transparency furthered the valid purpose of challenging the premise in other courts and cases.

3.      As intended, the revelations concerning Dr. Moline's paper led to scrutiny of a second article published shortly after, and that purported to build on, Dr. Moline's paper. That second article was written by Drs. Emory, Kradin, and Maddox (the "Authors"). *See* **Exhibit A**, Emory, et. al., *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients* (2020) (the "Emory Article" or the "Article"). Each of the Authors served as an expert for the asbestos mass tort plaintiffs' bar in support of claims against manufacturers of cosmetic talc products.

4.      The Emory Article advanced the same premise—and claimed to bolster—Dr. Moline's work. It states: "Recently, Moline et al, reported a series of 33 subjects with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc. We present 75 additional subjects, with malignant mesothelioma, whose only known exposure to asbestos was

1

cosmetic talc." Ex. A, Article at 2. The communications arm of the plaintiffs' asbestos bar billed the Article as "the most extensive case study to date on the topic."[1]

5.    But like Dr. Moline's paper, that claim was false. Individuals in the Emory Article had admitted to—and indeed had made claims seeking compensation for—exposure to other sources of asbestos. The Authors knew that, or recklessly disregarded substantial evidence to the contrary.

6.    Nor is it true that the individuals in the Emory Article are all "additional" to those in Dr. Moline's paper. Even based on the limited information available, at minimum one individual appears in both. The Article's assertion of incremental and corroborating findings is blatantly false.

7.    The Article was submitted to a journal where Dr. Moline (the author of the first paper) and Dr. Kradin (the co-author of the Article) serve as contributing editors. To paint the Article with a gloss of scientific rigor, the Article purported to be reviewed by qualified peers in the scientific community. However, these "peer reviewers" had no access to the underlying documentation which could be used to vet the accuracy of the Article's central claims. In fact, the Article was published a mere 10 days after it was submitted to the journal.

8.    The Emory Article demonstrates Plaintiffs' experts' tactics to pollute the scientific literature. They publish their junk litigation opinions in scientific journals. They use their credentials to instill their publications with false credibility. They then build from that fraudulent foundation by citing to each other's work, which manufactures a "body of literature" to present to judges and juries with the veneer of scientific legitimacy. And they actively resist attempts to make public the information that would reveal the deceit. In return, they are handsomely compensated

---

[1] https://www.asbestos.com/news/2020/04/01/cosmetic-talc-mesothelioma-study/

for their disparagement of the products that are the target of the plaintiffs' bar.[2] This trend is on a step upward trajectory, with increased litigation financing fueling extensive lawyer advertising that solicits large volumes of claimants regardless of merit.

9.      But this house of cards is collapsing as the truth comes to light. Like Dr. Moline, the Authors must be held accountable for their deceit and disparagement, which has caused harm to LLT, as well as all the women and men who have been misled into believing that talc powder caused their mesothelioma, and therefore have not addressed the true cause of their cancer. This must end.

## PARTIES

10.      LLT Management LLC ("LLT") is a Texas limited liability company with its principal place of business in New Jersey.

11.      LLT has one member: Johnson & Johnson Holdco (NA) Inc. Johnson & Johnson Holdco (NA) Inc. is a citizen of New Jersey. Johnson & Johnson Holdco (NA) Inc. is a corporation incorporated in and with its principal place of business in New Jersey. LLT is therefore a citizen of New Jersey.

12.      LLT is a wholly-owned indirect subsidiary of Johnson & Johnson. LLT owns all rights, causes of action and privileges, and is responsible for all claims related to Johnson's Baby Powder and Shower to Shower products, including liabilities arising from all claims (the "Talc Claims") relating in any way to injury or damage sustained or incurred in the exposure to talc or

---

[2] As just one example, in December 2022, the Southern District of Florida dismissed thousands of product liability claims advanced against pharmaceutical manufacturers, detailing the unfounded, unreliable and unscientific opinions that had been submitted by a roster of plaintiffs' experts— including Dr. Anne McTiernan, who, like Dr. Moline, also fabricated a false narrative regarding the very talc products at issue here. *In re Zantac (Ranitidine)*, MDL No. 2924, Doc. No. 6120 (S.D. Fla. Dec. 6, 2022).

talc-containing products (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws).

13.    Defendant Dr. Theresa Swain Emory is a pathologist affiliated with Peninsula Pathology Associates in Newport News, Virginia. Peninsula Pathology Associates provides litigation consulting services throughout the country and advertises the services of Dr. Emory on its website. Dr. Emory has been disclosed as a plaintiff's expert in over a dozen cosmetic talc/mesothelioma cases against LLT. Dr. Emory's domicile is in Virginia, and Dr. Emory is a citizen of Virginia.

14.    Defendant Dr. Richard Lawrence Kradin, is a pulmonologist and pathologist, and he is a Professor with American Scholars. Dr. Kradin has been disclosed as a plaintiff's expert in over 200 cosmetic talc/mesothelioma cases against LLT. He has provided deposition testimony in 18 talc/mesothelioma cases against LLT, as well as trial testimony in 4 of those cases. Dr. Kradin is a citizen of New Hampshire.

15.    Defendant Dr. John Coulter Maddox is a pathologist affiliated with Peninsula Pathology Associates in Newport News, Virginia. Peninsula Pathology Associates' website advertises Dr. Maddox's services as a litigation expert and highlights that Dr. Maddox "reviews about five percent of mesotheliomas [sic] cases in the U.S. as an expert witness." Dr. Maddox has been disclosed as a plaintiff's expert in over 200 cosmetic talc/mesothelioma cases against LLT. He has provided deposition testimony in 20 talc/mesothelioma cases against LLT, as well as trial testimony in 9 of those cases. Dr. Maddox's domicile is in Virginia, and Dr. Maddox is a citizen of Virginia.

**JURISDICTION**

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. LLT's Lanham Act claim arises under federal law. And this Court has supplemental jurisdiction over the remaining claims.

17.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees. LLT is a citizen of New Jersey, Dr. Kradin is a citizen of New Hampshire, and Drs. Emory and Maddox are citizens of Virginia.

18.     Venue is proper under 28 U.S.C. § 1391, which provides for proper venue in the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

19.     This complaint was previously filed on January 18, 2023 as an adversary proceeding in the United States Bankruptcy Court for the District of New Jersey (D.N.J. Bank. No. 23-ap-1022). That case was dismissed without prejudice on April 4, 2023 in conjunction with the dismissal of LLT's bankruptcy. This complaint was then filed again on July 7, 2023 in the United States District Court for the District of New Jersey (D.N.J. No. 23-cv-03649). That case was dismissed without prejudice on April 30, 2024 for lack of personal jurisdiction. LLT has therefore re-filed this complaint in the Eastern District of Virginia.

**FACTS**

I.     **Drs. Emory, Kradin, and Maddox: Plaintiffs' Paid Expert Witnesses.**

20.     Drs. Kradin, Maddox, and Emory have all made careers and small fortunes from testifying on behalf of the mass tort asbestos plaintiffs' bar.

5

21.     ***Dr. Emory***. Dr. Emory devotes half of her consulting work to asbestos litigation, where she always testifies on behalf of plaintiffs. For this work, she charges $600 per hour and $6,000 per day for trial testimony.

22.     In addition to her salary, Dr. Emory has an ownership interest in Peninsula Pathology Associates for which she receives a 22% distribution of the company's consulting profits. These profits include hundreds of thousands of dollars' worth of fees associated with asbestos litigation, including fees obtained by Dr. Maddox, her partner at Peninsula Pathology Associates.

23.     ***Dr. Kradin.*** Dr. Kradin has testified in asbestos-related litigation for over 30 years. Aside from approximately four or five instances, Dr. Kradin's work on asbestos litigation is always on behalf of plaintiffs. He works on approximately 50 to 75 asbestos cases per year, is deposed approximately 50 times per year, and has authored thousands of expert reports for plaintiffs' counsel.

24.     For this work, he is paid between approximately $250,000 and $400,000 per year (about 40% of his total income) and, in aggregate, has received over $3 million.

25.     Dr. Kradin has been disclosed as a plaintiff's expert in over 200 talc/mesothelioma cases against LLT. He has testified many times at both depositions and trials.

26.     ***Dr. Maddox.*** Dr. Maddox has been consulting in litigation on behalf of plaintiffs for more than 40 years. During this time, more than 90% of his cases have been on behalf of plaintiffs, including 100% of his litigation work since 2007. Dr. Maddox has been a paid expert in asbestos litigation for multiple plaintiffs' firms, including for Simon Greenstone Panatier, PC more than 200 times.

27.    As a paid expert while a partner at Peninsula Pathology Associates, Dr. Maddox charged $500 per hour for his litigation work and routinely consulted on more than 100 asbestos litigation cases per year. Since he retired from the clinical practice of medicine and gave up his full partnership at the end of 2019, all of his income has been from either litigation or deferred compensation from his former partnership.  Dr. Maddox has consistently earned hundreds of thousands of dollars per year for his litigation work, including approximately $125,000 from his litigation consulting in 2020.

28.    Before being paid to testify that talcum powder causes mesothelioma, Drs. Kradin and Emory never attributed their patients' mesothelioma to talcum powder in their respective clinical practices, despite having testified that the potential contamination of talc with asbestos has been known since the 1970s. Similarly, the only time Dr. Maddox concluded that a person's mesothelioma was caused by the use of talcum powder was when he was being paid as an expert for plaintiffs' lawyers. He testified in New Jersey in the *Henry* trial and the consolidated *Barden* trial against LLT.

## II.    The Authors Published Disparaging Statements In Their Article.

29.    In 2020, shortly after Dr. Moline published her deceitful and disparaging paper, the Authors published the Emory Article, reciting findings of a follow-on "study" that purported to provide incremental substantiation for the claim that the use of cosmetic talc powder causes mesothelioma.

30.    The Emory Article states that it "presents 75 additional subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc." Ex. A, Article at 2.

31.    Notably, however, the Authors *did not disclose* the names of the 75 individuals featured in the Article and have actively *attempted to conceal* the individuals' identities (as discussed further below).

32.    The Authors also *did not disclose* what is now irrefutable: all 75 individuals are plaintiffs in litigation where at least one of the Authors served as an expert witness on behalf of plaintiffs' counsel.

33.    Rather, the Article states only that "the cases were submitted in medico‑legal consultation." Ex. A, Article at 4. And the Article's conflict of interest statement only discloses that "Drs Emory, Maddox, and Kradin have testified in asbestos litigation, primarily for plaintiffs." Ex. A, Article at 6. That statement fails to inform readers both that the Authors are experts in litigation specifically related to cosmetic talc, and that they served as experts on behalf of the very plaintiffs who are the subjects of the Article.

34.    According to the Article: Dr. Maddox and Dr. Kradin "developed the concept and the design of the work." Ex. A, Article at 6. Dr. Emory "reviewed the materials, performed the statistical analysis, and was the primary author of the manuscript." *Id.* And Dr. Kradin "revised and gave the final approval of the version to be published." *Id.*

35.    Each Author contributed approximately one third of the cases to the Article, with slightly less than one-third coming from Dr. Emory and slightly more than one-third coming from Dr. Maddox.

36.    Dr. Kradin and Dr. Maddox communicated with Dr. Emory concerning the Article while Dr. Emory was in Virginia (where she and Dr. Maddox reside). Dr. Emory—the primary author—worked on the Article in Virginia and Colorado.  Dr. Emory was the "central fulcrum" of the Article. Dr. Kradin and Dr. Maddox each sent the information regarding the cases they contributed to Dr. Emory, who complied it and put it in a table for the Article. Dr. Kradin and Dr. Maddox also communicated suggestions and edits for the Article to Dr. Emory. And Dr. Emory

8

received the comments from the peer reviewers and distributed them to Dr. Kradin and Dr. Maddox.

37.     Additionally, Dr. Kradin communicated with Dr. Emory and Dr. Maddox regarding the tissue digestions in the cases that are the subjects of the Article. Dr. Kradin believed the fiber burden analyses should not have been included in the Article, but Dr. Maddox and Dr. Emory believed they should be – and Dr. Kradin was therefore "outvoted."

38.     The Emory Article states multiple times that the subjects of the Article had *no other exposure to asbestos* apart from alleged exposure to asbestos from talcum powder:

- "Methods: Seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders, were reviewed in medical-legal consultation." Ex. A, Article at 1.

- "We present 75 additional subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc." Ex. A, Article at 2.

- "Seventy-five subjects, whose only known exposure to asbestos was via cosmetic talc, were included for further examination." Ex. A, Article at 2.

39.     The Authors later published a response to a letter to the editor concerning their Article that doubled-down on these claims. *See* **Exhibit B**, Emory, et al., *Letter to the Editor: Authors' response to "malignant mesothelioma following exposure to cosmetic talc: Association, not causation"* (2020). In that response, the Authors similarly stated:

- "[W]e excluded those where a history of other asbestos exposures were present."

- "Our study is a case series of patients who developed mesothelioma, and whose only known exposure to asbestos was through cosmetic talc."

- "Our series of 75 additional individuals with malignant mesothelioma whose only known exposure was cosmetic talc is further evidence that cosmetic talc should be considered a probable cause of mesothelioma."

40.     The Authors submitted the Article to the American Journal of Industrial Medicine. That journal was the Authors' first choice for publication, and they did not submit their Article to any other journals.

41.     Dr. Moline and Dr. Kradin are both contributing editors for the American Journal of Industrial Medicine.[3]

42.     The journal states that submitted manuscripts are peer reviewed before they are published, which conveys to the readers that claims made therein have been vetted and are substantiated. Its website states to potential authors: "You must also provide a PDF version of the manuscript for Peer Review." Undisclosed at the time but now known, the "peer reviewers" of the Article were not afforded access to any of the underlying data that would have been necessary to vet the assertion that individuals had no non-talc exposures to asbestos.

43.     In fact, the Article was published a mere 10 days after it was submitted to the journal. Ex. A, Article at 1.

44.     The American Journal of Industrial Medicine is operated by the publishing company Wiley, which is headquartered in New Jersey.

**III.     The Authors Republished Their Deceitful And Disparaging Claims**

45.     After publishing the Article, the Authors republished the false claims made therein in the public domain, which were repeated by other outlets reporting on the Article, including republication of the Article's claims by the asbestos mass tort plaintiffs' bar for whom the Authors work.

46.     In early 2020, for example, Dr. Emory publicly stated that the Authors "investigated 75 individuals with malignant mesothelioma, whose only known exposure to asbestos was

---

[3] https://onlinelibrary.wiley.com/page/journal/10970274/homepage/editorialboard.html

repeated exposures to cosmetic talcum powder." **Exhibit C**, *Mesothelioma and Repeated Cosmetic Talc Exposure*, Medical Research.com (Mar. 18, 2020).[4]

47.      VeryWellHealth.com wrote that "studies have linked mesothelioma to repeated use of cosmetic talcum powder contaminated with asbestos," citing the Emory Article. **Exhibit D**, *Does Talcum Powder Cause Cancer?* VeryWellHealth.com (Dec. 15, 2020).[5]

48.      SurvivingMesothelioma.com wrote that "A new study in the American Journal of Industrial Medicine appears to offer definitive evidence that repeated exposure to cosmetic talc can cause mesothelioma," citing the Emory Article.  **Exhibit E**, A. Strauss, *Cosmetic Talc Can Cause Mesothelioma, Study Finds*, SurvivingMesothelioma.com (Mar. 21, 2020).[6]  The website goes on to state that "Manufactures like Johnson & Johnson insist that they are pure.  But the new study shows that may not be the case," citing to the Emory Article.

49.      The plaintiffs' asbestos bar also promoted the Article. For example, Asbestos.com published a story on the Article, describing it as "the most extensive case study to date on the topic." **Exhibit F**, *Latest Study Reinforces Cosmetic Talc, Mesothelioma Link*, Asbestos.com (Apr. 1, 2020).[7] Asbestos.com is sponsored by plaintiffs' law firms concentrating in asbestos litigation. The story states that the "study involved 75 mesothelioma patients — including 64 women — who believed their only exposure to asbestos was through cosmetic talcum powder." *Id.*

50.      Mesothelioma.net published a story about the Article that begins: "Recent headlines have featured the stories of mesothelioma victims filing successful lawsuits against Johnson & Johnson and other cosmetic talc product companies, holding them responsible for their

---

[4] https://medicalresearch.com/mesothelioma-and-repeated-cosmetic-talc-exposure/

[5] https://www.verywellhealth.com/does-talc-cause-cancer-5088678

[6] https://survivingmesothelioma.com/cosmetic-talc-casuse-mesothelioma/

[7] https://www.asbestos.com/news/2020/04/01/cosmetic-talc-mesothelioma-study/

terminal diagnoses." **Exhibit G**, *Study Concludes That Exposure To Cosmetic Talc Can Lead to Mesothelioma*, Mesothelioma.net (Mar. 18, 2020).[8] The story states that the Emory Article "included seventy-five individuals, all of whom had been diagnosed with malignant mesothelioma and whose only known exposure to asbestos was repeated exposure to cosmetic talcum powders." *Id.* Mesothelioma.net is funded by a lawyer who handles legal proceedings for asbestos-related injuries.

51.     MesotheliomaGuide.com has a page devoted to "Talc and Mesothelioma" which begins: "Johnson & Johnson is the brand most connected to asbestos in talc." **Exhibit H,** *Talc and Mesothelioma*, MesotheliomaGuide.com.[9] It states: "A second study, which was published in the American Journal of Industrial Medicine, analyzed the connection between cosmetic talc and mesothelioma. The researchers found 75 people whose only known asbestos exposure was from asbestos-contaminated talc." *Id.* The website is sponsored by a plaintiffs' law firm which focuses on asbestos litigation.

52.     AsbestosJustice.co.uk published a story stating that the "study examined 75 mesothelioma patients who had used cosmetic talc frequently for decades and had no other known asbestos exposure." **Exhibit I,** *Study confirms link between cosmetic talc and mesothelioma*, AsbestosJustice.co.uk.[10] Asbestos Justice is a "trading name" of Oliver & Co Solicitors Limited.

53.     In April 2020, TalcumPowderCancerLawsuit.com published a story stating that Dr. Emory and her coauthors "found that talc products were contaminated and asbestos and caused

---

[8] https://mesothelioma.net/mesothelioma-news/study-concludes-that-exposure-to-cosmetic-talc-can-lead-to-mesothelioma/

[9] https://www.mesotheliomaguide.com/mesothelioma/causes/talc-mesothelioma-from-asbestos-exposure/

[10] https://www.asbestosjustice.co.uk/study-confirms-link-between-cosmetic-talc-and-mesothelioma/

mesothelioma in a large percentage of the 75 people in the study . . . " **Exhibit J**, *New Study Finds Asbestos Fibers in Lung Tissue of Mesothelioma Victims*, TalcumPowderCancerLawsuit.com.[11] This website is maintained by OnderLaw, LLC, a plaintiffs' firm that has handled cosmetic talcum powder claims.

54.    The Law Offices of Kenneth A. Wilhelm cited the Emory Article, claiming that it "has strengthened the link between prolonged exposure to cosmetic talcum powder and a rare form of cancer called mesothelioma" while also advertising litigation concerning Johnson's Baby Powder.[12] **Exhibit K**, K. Wilhelm, *New Study Reinforces Link Between Talc and Mesothelioma*, Work4YouLaw.com (2020).

55.    Karst & von Oiste LLP also cited the Emory Article on its website MesoLawsuitAfterDeath.com, stating that it "featured 75 mesothelioma patients who thought their sole exposure to asbestos was through the use of talcum powder." **Exhibit L**, Karst & von Oiste LLP, *New Clinical Study Finds Connection Between Talc and Malignant Mesothelioma*, MesoLawsuitAfterDeath.com (May 1, 2020).[13]

56.    The Authors also republished the central thesis of the Article in public litigation. After the online publication of the Article, the Authors were disclosed in dozens of cosmetic talc/mesothelioma cases against LLT, and they routinely relied on their Article in those cases and cases against other talc defendants.

---

[11] https://www.talcumpowdercancerlawsuit.com/news/new-study-finds-asbestos-fibers-in-lung.asp

[12] https://www.work4youlaw.com/blog/new-study-reinforces-link-between-talc-and-mesothelioma/amp/

[13] https://www.mesolawsuitafterdeath.com/blog/new-clinical-study-finds-connection-between-talc-and-malignant-mesothelioma/

57.    For example, in January 2023, Dr. Kradin testified that "any evidence of additional exposures" would have excluded that individual from the Article's case series.

58.    In one cosmetic talc trial, plaintiffs' counsel told the jury in her opening statement: "Dr. Moline and Dr. Emory also studied this extensively and they both published peer-reviewed papers on two case series of individuals who consistently basically were only exposed to asbestos from cosmetic talc. Dr. Moline's paper follows 33 people and Dr. Emory's, 75. Huge case studies that show these people were only exposed to asbestos from talc and they have mesothelioma."

59.    This is the same Plaintiffs' counsel who threatened to report Dr. Moline's employer's lawyer to HHS and the New York Bar if he did not claw back the document revealing that Betty Bell was one of the subjects in Dr. Moline's paper (which demonstrated the falsity of that paper). Ms. Bell had filed workers' compensation claims with the North Carolina Industrial Commission in September 2015, asserting, under criminal penalty for false statements, that she was exposed to asbestos during prior employment with two textile employers.

60.    Dr. Emory later testified at that trial and relied on her Article. She told the jury: "[W]e took all the people that had no other evidence of exposure to asbestos except for their use of cosmetic talc and we had 75 people left." She said again moments later: "[W]hat we found was we had 75 people whose only known exposure was the use of cosmetic talc that developed malignant mesothelioma, which is a signal tumor of asbestos exposure." She also claimed she could not ethically release the names of the subjects of her Article.

61.    Moreover, in at least 41 cosmetic talc/mesothelioma cases against LLT, a combined 9 other plaintiff experts have relied on the Article in either their testimony or court disclosures.

62.    Plaintiffs' expert Dr. Finkelstein, for example, amended a litigation report one month after the Article was published to add a discussion of the Article. He wrote: "Emory and

14

colleagues presented a case series of seventy-five individuals (64 females; 11 males) with malignant mesothelioma, whose only known exposure to asbestos was repeated exposures to cosmetic talcum powders, and who were reviewed in medical-legal consultation."

63.     As another example, Dr. Moline issued a report discussing the Emory Article, stating: "I have recently published a paper, along with co-authors, that describes 33 cases of mesothelioma among individuals whose only known exposure to asbestos was through their use of cosmetic talc (Moline et al, 2019). Emory et al. (2020) has published a paper on an additional 75 individuals with mesothelioma whose source of asbestos exposure was cosmetic talc. Together, these papers show over 110 patients with mesothelioma and cosmetic talc use."

64.     Dr. Moline later discussed the Emory Article at trial in a different case, testifying that the 75 individuals in the Article represents "a significant number of people" and that the Article is "in line with other papers in the literature, and it just adds to the body of -- of scientific knowledge."

65.     Another plaintiffs' expert at that same trial (Dr. Allan Smith) testified that the "main source of information that [he is] aware of today" that he relies upon to testify that talcum powder causes mesothelioma "are from some recent case series:" Dr. Moline's paper and the Emory Article.

66.     In a separate trial, a different plaintiffs' expert (Dr. David Egilman) similarly relied on the Emory Article.

67.     Outside of court proceedings, Dr. Moline has issued public statements relying upon the Emory Article to buttress her own paper.  For example, in written comments on EPA's Draft Asbestos Risk Evaluation, Dr. Moline cited to the Emory Article stating: "In 2020 Emory et al. published a larger case series of 75 additional patients with cosmetic talcum powder exposure and

mesothelioma. There are now over 110 cases of mesothelioma reported in the peer-reviewed medical literature identifying mesothelioma among users of cosmetic talc."[14] **Exhibit M**, Toxic Substances Control Act (TSCA) Science Advisory Committee on Chemicals Review of Risk Evaluation for Asbestos, Comment submitted by Jacqueline Moline (May 31, 2020).

68.    Yet, facts have now come to light making clear that the statement that none of the 75 individuals had any other exposure to asbestos is simply not true, as described more fully in Part IV below.

**IV.    The Authors Knew Their Statements Were False Or Recklessly Ignored Available Information Demonstrating Their Falsity When Made.**

69.    When the Authors published their statements in the public domain, to the scientific community, and in various courts across the country, they knew that the premise of their position— that they conducted a "study" of 75 mesothelioma patients whose sole exposure to asbestos was through talc powder—was false or recklessly ignored available information demonstrating its falsity.

70.    The truth is that the Authors were intimately familiar with the case histories of the 75 individuals referenced in the Article based on their role as plaintiffs' experts in the underlying tort cases in which those individuals had asserted claims against LLT and others.

71.    Given that the Authors chose to omit certain information regarding the individuals in the Article, it is difficult to match every one of the Article's subjects to a litigation plaintiff. However, even with that limitation, the record now indicates that at least six individuals in the Article are plaintiffs with documented alternative exposures to asbestos.

---

[14] https://www.regulations.gov/docket/EPA-HQ-OPPT-2019-0501/comments?filter=moline

A.    Case #72

72.    Dr. Kradin communicated with Dr. Emory and told her that she should make absolutely certain that there was no overlap between the Emory Article and Dr. Moline's paper.

73.    Indeed, the Article states that all the underlying individuals are "additional" subjects to those reported in Dr. Moline's paper: "Recently, Moline et al, reported a series of 33 subjects with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc. We present 75 *additional subjects*, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc." Ex. A, Article at 2. (emphasis added).

74.    Yet the case involving Stephen Lanzo was included in both Dr. Moline's paper (Case # 6) and the Emory Article (Case #72).

|  | **Mr. Lanzo** | **Moline Case #6** | **Emory Case #72** |
|---|---|---|---|
| **Gender** | Male | Male | Male |
| **Year of Diagnosis** | 2016 | 2016 | 2016 |
| **Age At Diagnosis** | 43 | 43 | 44 |
| **Mesothelioma Site** | Pleural | Pleural | Pleural |
| **Estimated Years Of Use** | 40 | 40 | 43 |
| **Tissue Digestion (Type)** | Lymph Node | Lymph Node | Lymph Node |
| **Tissue Digestion (Concentration)** | 17,250 f/g | 17,250 f/g | 17,250 f/g |
| **Tissue Digestion (Limit of Detection)** | 3,450 f/g | 3,450 f/g | 3,450 f/g |

75.    Dr. Kradin told Dr. Emory and Dr. Maddox that if there was any question about alternative exposures to asbestos, those cases should not be included in the Article. Yet the information uncovered in litigation of Mr. Lanzo's claims demonstrates the falsity of the Article's central premise: that the individuals had no non-talc potential exposures to asbestos.

76.    As background, the Authors state in their Article that "crocidolite" asbestos fibers are generally found in "[i]ndustrial asbestos products," and that it is not among the types of asbestos generally present in cosmetic talc. Ex. A, Article at 2.

77.    To bolster their claim that Mr. Lanzo's only asbestos exposure was to cosmetic talc, the Authors stated in their Article that crocidolite asbestos was not found in the tissue of Case #72. Specifically, they state that the only asbestos types found in Case #72's tissue were anthophyllite and tremolite—i.e. **not** crocidolite.

78.    The record from the *Lanzo* litigation establishes the falsity of that claim. In 2016, Stephen Lanzo brought a claim against LLT alleging that he was exposed to asbestos through use of Johnson's Baby Powder. Mr. Lanzo is a New Jersey resident, and his case was filed in New Jersey. The tissue analysis discussed in the Article was conducted in connection with Mr. Lanzo's New Jersey case.

79.    Despite attempting to claim otherwise, crocidolite asbestos—from industrial products not cosmetic talc—was in fact found in Mr. Lanzo's tissue.[15] In the *Lanzo* case, **Plaintiff's expert**, Mr. Lee Poye, analyzed Mr. Lanzo's tissue and found crocidolite asbestos:

---

[15] Strangely, the Article also reports that the tissue analysis for Case #70 found "amosite," another type of commercial asbestos not alleged to be associated with cosmetic talc. Ex. A, Article at 5. This is yet another potential example of a case with an alternative asbestos exposure.



80.     Defense expert, Dr. Matthew Sanchez, also found crocidolite in Mr. Lanzo's tissue:



81.     The statement in the Article that no crocidolite was found in the tissue for Case #72 is false.

82.     Additionally, Mr. Lanzo had potential exposures to asbestos from two sources other than Johnson's Baby Powder.

83.     First, 60 linear feet of exposed asbestos pipe was removed from Mr. Lanzo's basement. The basement was a family room with a TV and couches, and Mr. Lanzo spent time in the basement.

84.     Second, in his elementary school, damage to the asbestos pipe insulation was found in multiple locations, including hallways, classrooms, the lunchroom, and the boys' locker room.

85.     In the school he attended from grades 1-4, the school district found what amounted to 64 bags of friable asbestos-containing material which would have been present while he attended (and removed after he left).

86.     In the school he attended for grade 5, large amounts of friable asbestos were found and removed from the boys' bathroom and classrooms in the years after his attendance.

87.     In his middle school, abatement records show that asbestos-containing material was removed from classrooms after Mr. Lanzo was a student at the school. At one point, 67 bags of friable waste was removed from the school. All this asbestos would have been present when Mr. Lanzo was there.

88.     In his high school, hundreds of bags of friable asbestos were removed. The school district removed 200 square-feet of friable asbestos from the ground-floor lobby from 1989-1992—meaning some of the asbestos was removed during Mr. Lanzo's junior and senior year.

89.     Neither potential exposure is mentioned in the Article. That Mr. Lanzo appears in both the Emory Article and Dr. Moline's paper belies the Authors' claims that their Article bolstered Dr. Moline's work.

90.     The Authors' statement that there were no other asbestos exposures for Case #72 is false.

**B.     Case #67**

91.     Plaintiff Pauline Citizen filed a claim against LLT, other cosmetic talc defendants, and non-talc defendants alleging that she was exposed to asbestos in their products.

92.     Dr. Maddox and Dr. Kradin were retained as experts in Ms. Citizen's case, though Dr. Kradin was later withdrawn as an expert.

93.     Upon information and belief, Case #67 is a likely match for Ms. Citizen:

| | Ms. Citizen | Case #67 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 44 | 44 |
| Mesothelioma Site | Peritoneal | Peritoneal |
| Estimated Years Of Use | 30 | 30 |
| Tissue Digestion (Type) | Omentum Lymph Node | Omentum Lymph Node |
| Tissue Digestion (Concentration) | 1,917 f/g 1,725 f/g | 1,917 f/g 1,725 f/g |
| Tissue Digestion (Limit of Detection) | 639 f/g 1,725 f/g | 639 f/g 1,725 f/g |
| Tissue Digestion (weight) | 0.54 g 0.20 g | 0.54 g 0.20 g |

94.     Ms. Citizen's own *complaint* alleges exposure from two non-talc sources: asbestos brought home from both her mother and father's occupations. The complaint named as defendants her parents' employers and companies alleged to have supplied those employers with asbestos.

21

95.    The Article states that "[e]xposures were identified through sworn deposition testimonies and answers to sworn interrogatories." Ex. A, Article at 2.

96.    But Ms. Citizen's own interrogatory responses detail her allegations of take-home exposure from her parents' respective occupations:

> At this time, Plaintiff alleges she was exposed to asbestos and/or asbestos-containing products from asbestos fibers brought home on the clothes and person of her father, Paul Eugene Citizen as a result of his work as a mechanic at Pipe Distributors, Inc.  Plaintiff also alleges she was exposed to asbestos and/or asbestos-containing products from asbestos fibers brought home on the clothes and person of her mother, Mary Elizabeth Truitt Citizen Brown as a result of her work for Olin Corporation p/k/a Olin Mathieson Chemical Corporation.

97.    Indeed, even Dr. Moline, serving as Plaintiffs' expert in the *Citizen* case, concluded in her report that Ms. Citizen "has two possible additional exposures to asbestos" beyond the claimed exposure from talc.

98.    The Authors' statement that there were no other asbestos exposures for Case #67 is false.

**C.    Case #65**

99.    Plaintiff Robert Blinkinsop filed a claim against LLT and other cosmetic talc defendants alleging that he was exposed to asbestos in their products.

100.    Upon information and belief, Case #65 is a likely match for Mr. Blinkinsop:

| | Mr. Blinkinsop | Case #65 |
|---|---|---|
| Gender | Male | Male |
| Year of Diagnosis | 2017 | 2017 |
| Age At Diagnosis | 64 | 64 |
| Mesothelioma Site | Pleural | Pleural |
| Estimated Years Of Use | 18 | 18 |
| Tissue Digestion (Type) | Lung Lymph Node | Lung Lymph Node |
| Tissue Digestion (Concentration) | 8,625 f/g | 8,625 f/g |
| Tissue Digestion (Limit of Detection) | 4,313 f/g | 4,313 f/g |
| Tissue Digestion (weight) | 0.08 g 0.34 g | 0.08 g 0.34 g |

101.    Mr. Blinkinsop's case went to trial, and the jury returned a *full defense verdict*. The jury found that neither Johnson's Baby Powder nor Shower to Shower were substantial factors in causing Mr. Blinkinsop's disease.

102.    Before Mr. Blinkinsop filed his complaint against LLT, he visited UCLA Health System in August of 2017. During that visit, Mr. Blinkinsop reported that he suspected that he had been exposed to asbestos in the 1980s through demolition-based construction work.

103.    In addition, Mr. Blinkinsop testified that he was present during what he believed to be asbestos abatement work conducted at a high school where he worked as an assistant principal in 1999 or 2000.

104.    Plaintiffs' expert Dr. Gordon concluded that he found an "asbestos body" in Mr. Blinkinsop's tissue—something not mentioned in the Emory Article. At trial, Defendants presented scientific evidence demonstrating that asbestos bodies are markers of exposure to *commercial* forms of asbestos including the types used in construction projects. That evidence showed that 96 percent of asbestos bodies form on commercial types of asbestos rather than the types of asbestos plaintiffs claimed were present in Johnson's Baby Powder and Shower to Shower.

105.    These potential exposures from construction work and the school were significant enough that they were included on the jury form that the jury used when considering what asbestos exposures contributed to Mr. Blinkinsop's disease, though the jury never needed to reach that question.

106.    The Authors' statement that there were no other asbestos exposures for Case #65 is false.

**D.    Case #75**

107.    Plaintiff Sharon Hanson filed a claim against another cosmetic talc defendant alleging that she was exposed to asbestos in their products.

108.    Dr. Kradin appeared as an expert in Ms. Hanson's case.

109.    Upon information and belief, Case #75 is a likely match for Sharon Hanson.

| | Ms. Hanson | Case #75 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 62 | 62 |
| Mesothelioma Site | Pleural | Pleural |
| Estimated Years Of Use | 14 | 14 |
| Tissue Digestion (Type) | Lung<br>Ovary | Lung<br>Ovary |
| Tissue Digestion (Concentration) | 3,450 f/g<br>2,070 f/g | 3,450 f/g<br>2,070 f/g |
| Tissue Digestion (Limit of Detection) | 1,150 f/g<br>2,070 f/g | 1,150 f/g<br>2,070 f/g |
| Tissue Digestion (weight) | 0.6 f/g<br>0.2 f/g | 0.6 f/g<br>0.2 f/g |

110.    Ms. Hanson's husband, Douglas Hanson, testified that he was potentially exposed to asbestos while working as an engineer for PPG Industries from 1974 to 1985, and again as a manager for LCP Chemicals from 1987 to 1993. One of Mr. Hanson's former coworkers at PPG Industries who worked in the same area during the same timeframe as Mr. Hanson testified that he

worked hands on with raw asbestos and other asbestos-containing products. Ms. Hanson testified that during Mr. Hanson's employment at these two companies, she was primarily responsible for household laundry.

111.    During his deposition in Ms. Hanson's case, Dr. Kradin acknowledged that "it has been repeatedly and consistently demonstrated in the medical and scientific literature that family members exposed to asbestos dust from laundering a worker's clothing have . . . a significantly increased risk of developing mesothelioma."

112.    Nevertheless, the Authors represented that Case #75 had no exposures to asbestos other than talcum powder.

113.    The court in the *Hanson* case granted summary judgment in favor of the talc defendant, concluding that "causation requires a showing more than what Dr. Kradin offers." *Hanson v. Colgate-Palmolive Co.*, No. 16-cv-34, 2018 WL 4686438, at *9 (S.D. Ga. Sept. 28, 2018).

114.    The Authors' statement that there were no other asbestos exposures for Case #75 at least recklessly disregards available information.

**E.    Case #8**

115.    Plaintiff Ilene Brick brought a claim against LLT, other cosmetic talc defendants, and another non-talc defendant alleging that she was exposed to asbestos through use of Johnson's Baby Powder and Kent Cigarettes.

116.    Dr. Kradin appeared as an expert in Ms. Brick's case.

117.    Only limited information is provided about Case #8 because no tissue analysis results were reported in the Article. However, the information provided for Case #8 largely matches Ms. Brick, including, most strikingly, that both Case #8 and Ms. Brick were diagnosed with mesothelioma at 94-years old.

118.    Upon information and belief, Case #8 is a possible match for Ms. Brick.

| | Ms. Brick | Case #8 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2017 | 2017 |
| Age At Diagnosis | 94 | 94 |
| Mesothelioma Site | Pleural | Pleural |
| Histology | Epithelioid | Epithelioid |
| Estimated Years of Use | 60 | 60 |
| Estimated Latency (yrs) | 68-77 (per Dr. Kradin's Report) [16] | 72 |

119.    Ms. Brick's complaint also named Lorillard Tobacco Company as a defendant. She claimed she was exposed to asbestos through smoking Kent cigarettes with "Micronite" filters containing crocidolite asbestos.

120.    Dr. Kradin's *own expert report* in Ms. Brick's case from *2017* (well before the Emory Article was published) stated that Ms. Brick was exposed to asbestos-containing cigarettes known as Kent cigarettes.

121.    Dr. Kradin detailed in his report how smoking Kent cigarettes led to high levels of exposures to a particularly potent type of asbestos: "From 1952 to early 1957, 12 billion Kent cigarettes were sold with 'Micronite' filters containing crocidolite asbestos. A pack-per-day smoker has been estimated to have inhaled >100 million asbestos fibers per year. . . . Crocidolite asbestos is recognized as the most carcinogenic type of asbestos on a per fiber basis, and individuals exposed to crocidolite show an increased incidence of malignant mesothelioma."

---

[16] Dr. Kradin's report in Ms. Brick's case did not include an exact date that Ms. Brick first used talc, stating only that Ms. Brick's use began "in the 1940's"—representing a potential "latency" between 68 and 77 years. The Authors may have simply compared the midpoint of that decade (i.e. 1945) to her diagnosis year (2017) to arrive at the estimated 72-year "latency." Ms. Brick's deposition testimony specified that she began using Johnson's Baby Powder in 1947 or 1948, which would be a 69-70 year "latency."

122.   As Dr. Kradin documented in his expert report, "[i]n 1952, [Ms. Brick] began to purchase her own Kent cigarettes. She smoked as much as a package a day by 1955. She quit smoking Kent cigarettes sometime in the 1960's."

123.   Dr. Kradin even stated the asbestos exposure from Kent cigarettes were a cause of Ms. Brick's mesothelioma:

> **Conclusions:** Ms. Brick has been diagnosed with diffuse malignant mesothelioma of the left chest with widespread pulmonary metastases and her prognosis is poor. It is my opinion that her malignant mesothelioma was caused by her cumulative exposures to asbestos from cosmetic talc and the inhalation of crocidolite asbestos in Kent cigarettes.

124.   The Authors' statement that there were no other asbestos exposures for Case #8 is false.

**F.   Case #33**

125.   Plaintiff Rosalind Henry brought a claim against LLT alleging that she was exposed to asbestos through the use of Johnson's Baby Powder and other talc products.

126.   Dr. Maddox testified at Ms. Henry's trial in New Jersey.

127.   Only limited information is provided about Case #33 because no tissue analysis results were reported in the Article. However, the information provided for Case #33 matches Ms. Henry

128.   Upon information and belief, Case #33 is a possible match for Ms. Henry.

| | Ms. Henry | Case #33 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2016 | 2016 |
| Age At Diagnosis | 68 | 68 |
| Mesothelioma Site | Pleural | Pleural |
| Histology | Epithelioid | Epithelioid |
| Estimated Years of Use | 38 | 38 |
| Estimated Latency (yrs) | 64 | 64 |

129.    But Ms. Henry's medical records state: "Notes she did have asbestos exposure through her job in the past, worked for a company which cleaned Navy ships."

130.    Ms. Henry's medical records also state: "She recalls a possible asbestos exposure when she did office work in an old building."

131.    Dr. Maddox knew about these exposures because he was cross examined about them at trial.

132.    The Authors' statement that there were no other asbestos exposures for Case #33 is false.

V.     **The Authors And Plaintiffs' Counsel Concealed The Falsity Of Their Statements.**

133.    Even before the Article was published, Plaintiffs' counsel sought to ensure that the identities of the individuals would not be made public.

134.    Before publication, Dr. Maddox contacted plaintiffs' law firms and asked whether they had any objections to the Article. The one item he heard from the plaintiff's law firms was the insistence that the data be kept anonymous.

135.    After publishing the Article, the Authors and one of their employers resisted efforts by others to obtain information about their cases which would uncover the Article's false premise.

136.    On at least nine separate occasions, the Authors refused to testify at their depositions in cases against LLT regarding the identities of the individuals in their Article. They

28

often cited HIPAA as the basis for their refusal to testify, though the *Bell* Court concluded that

HIPAA did not apply to the identity of an individual in the similar context of Dr. Moline's paper.

137.    As some examples of their refusal to testify:

- **April 2020 (Emory):** "Q. [W]ill you provide the names of those patients? A. Absolutely not. That would be a violation of HIPAA."

- **May 2020 (Maddox):** "I cannot answer questions that have to do with any specific individual or case..."

- **August 2020 (Kradin):** "Q. And is it your position that you will not reveal the identities of the cases and the theory? A. That would be my position, consistent with Dr. Emory and Dr. Maddox, I believe."

138.    This refusal has continued as recently as last month. In a May 2023 deposition,

even though Dr. Kradin acknowledged he would be relying on the Article he authored for purposes

of his opinion, he refused to answer any questions even ***related*** to the Article.

- **Q.** And if I have written reports that I contend your –

  **A.** Sir, I'm not going to answer this -- anything related to this paper at this point with you.

139.    He also refused to testify about prior litigation reports:

- **Q.** [A]re you willing to look at Ms. Brick's written report that you issued?

  **A.** No, because this -- because I'm here to testify about Mr. Streck, not Ms. Brick, so the answer is, no, I'm not.

140.    Additionally, Dr. Kradin and Dr. Maddox have dodged disclosing the identity of

the individuals in the Article by testifying that they did not retain any documentation showing their

identity. Dr. Maddox said that he no longer had the key that would match cases in the article to

litigation plaintiffs because he relinquished it when he delivered the data to Dr. Emory. Dr. Kradin

similarly has said that he does not have information that could identify the individuals in the Emory

Article because he did not keep the identifying records.

141.    On top of that, Dr. Emory refused to reveal who performed the tissue analyses reported in the Article (something the Article itself does not disclose): "We're not going to do that. We're not releasing it."

142.    Dr. Maddox and Dr. Emory's company, Peninsula Pathology Associates, also moved to quash a subpoena seeking to uncover the identity of the individuals in the Article. *See* Motion to Quash (ECF 1), *In Re Subpoena For Documents Issued To Peninsula Pathology Associates*, 22-mc-1 (E.D.Va., Nov. 18, 2022).

**VI.    LLT Was Gravely Harmed By The Authors' False Statements.**

143.    The Authors' disparagement of Johnson's Baby Powder and Shower to Shower talc products for their own aggrandizement harmed LLT.

144.    Drs. Emory, Maddox, and Kradin knew that LLT's principal place of business was in New Jersey. They targeted New Jersey with their false statements, and New Jersey is the focal point of their false statements.

145.    The Article was published in March 2020. The sales volume and profits from Johnson's Baby Powder declined in 2020. And an ever-increasing percentage of Johnson's Baby Powder sales was the corn starch-based version compared to the talc-based version. The Authors' statements were a cause of this sales decline.

146.    LLT announced in May 2020 its discontinuation of talc-based Johnson's Baby Powder in the United States and Canada. As the press release at the time explained: "Demand for talc-based Johnson's Baby Powder in North America ha[d] been declining due in large part to changes in consumer habits and fueled by misinformation around the safety of the product and a constant barrage of litigation advertising." The Emory Article is an element of that misinformation.

147.    LLT also incurred substantial costs as a direct result of the Authors' false statements. Among other costs, LLT spent millions of dollars in fees paid to attorneys, expert witnesses, and

other professionals to investigate, respond to, defend against, and otherwise counteract the Authors'
false statements. That included deposing the Authors multiple times regarding their Article. The
Authors' false statements also had the effect of increasing settlement values, which continued up
until the LLT bankruptcy proceedings began.

148.    Indeed, the Authors' false statements have forced LLT to file this lawsuit to correct
the record.

## CAUSES OF ACTION

### Count I: Injurious Falsehood / Product Disparagement

149.    LLT hereby incorporates each preceding paragraph as though fully set forth herein.

150.    The Authors made statements that contain false and untrue assertions of fact,
including the false statements referenced above, which include, but are not limited to:

    a.    The multiple factual assertions in the Article, including (emphasis added):

        i.    "Methods: Seventy‑five individuals (64 females; 11 males) with
malignant mesothelioma, ***whose only known exposure to asbestos
was repeated exposures to cosmetic talcum powders,*** were
reviewed in medical‑legal consultation." Ex. A, Article at 1.

        ii.    "We present 75 additional subjects, with malignant mesothelioma,
***whose only known exposure to asbestos was cosmetic talc.***" Ex. A,
Article at 2.

        iii.    "Seventy‑five subjects, ***whose only known exposure to asbestos
was via cosmetic talc***, were included for further examination." Ex.
A, Article at 2.

        b.    The multiple factual assertions in the letter to the editor response (Exhibit B), including (emphasis added):

        i.    "[W]e ***excluded those where a history of other asbestos exposures were present***."

        ii.    "Our study is a case series of patients who developed mesothelioma, and ***whose only known exposure to asbestos was through cosmetic talc***."

        iii.    "Our series of 75 additional individuals with malignant mesothelioma ***whose only known exposure was cosmetic talc*** is further evidence that cosmetic talc should be considered a probable cause of mesothelioma."

151.    Dr. Emory's statement to MedicalResearch.com stating that the Authors "investigated 75 individuals with malignant mesothelioma, ***whose only known exposure to asbestos was repeated exposures to cosmetic talcum powder***." Ex. C, *Mesothelioma and Repeated Cosmetic Talc Exposure*, Medical Research.com (Mar. 18, 2020) (emphasis added). The Authors published the false statements alleged herein to others, including through electronic and hard-copy publication of the Article. The Authors' false statements were read and otherwise received by the public at large, consumers and manufacturers of cosmetic talc products, scientists, and attorneys and expert witnesses involved in talcum powder litigation, among others.

152.    The Authors' false Article has been republished by numerous sources, relied upon by plaintiffs' multiple expert witnesses in talc litigation, and considered by judges and juries throughout the country adjudicating cosmetic talc claims.

153.    The Authors intended and/or reasonably anticipated that the publication of their false statements would disparage the safety of the Johnson's Baby Powder and Shower to Shower products and harm LLT's interests. The Authors' false statements did disparage the safety of those products.

154.    The Authors acted with actual malice because their false statements were made with the knowledge that they were false and/or with reckless disregard as to their truth or falsity. Moreover, as described herein, the Authors have repeatedly sought to conceal evidence demonstrating the falsity of their statements, highlighting that their statements were made with knowledge that they were false and/or with reckless disregard as to their truth or falsity. Their acts of concealment include statements reaffirming the false statements in the Article and refusing to disclose the identity of the 75 subjects of the Article based on unsupported claims of confidentiality.

155.    The Authors acted without any privilege, authorization, or immunity in making their false statements. The statements alleged herein are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying their Article.

156.    The Authors' false statements were made of and concerning LLT's products. The Authors' false statements impugned the safety of all cosmetic talc products, including Johnson's Baby Powder and Shower to Shower. Johnson's Baby Powder and Shower to Shower products were well-recognized, the leading brands among a discrete and limited number of cosmetic talc products in the market.

157.    On information and belief, Johnson's Baby Powder and Shower to Shower together maintained well over a majority of the market share for talc powder products in the United States

33

before their discontinuation. Any comments disparaging the safety of cosmetic talc generally necessarily disparaged those products.

158.    To support their contention of the presence of asbestos in cosmetic talc, the Authors relied on the paper *Steffen* (2020). Ex. A, Article at 6, n.10. That paper—co-authored by numerous Plaintiffs' experts—discusses litigation testing of Johnson's Baby Powder and Shower to Shower. References to those products permeate the paper. The Authors of the Emory Article also refer to 1970s testing of Johnson's Baby Powder. Ex. A, Article at 1-2 & n.6.

159.    Various websites linked the Article to Johnson & Johnson and Johnson's Baby Powder, thereby demonstrating that readers of the statements in fact associated them with LLT's products. Mesothelioma.net published a story about the Article that begins: "Recent headlines have featured the stories of mesothelioma victims filing successful lawsuits against Johnson & Johnson and other cosmetic talc product companies, holding them responsible for their terminal diagnoses." Ex. G., *Study Concludes That Exposure To Cosmetic Talc Can Lead to Mesothelioma*, Mesothelioma.net (Mar. 18, 2020).[17] The story states that the Emory Article "included seventy-five individuals, all of whom had been diagnosed with malignant mesothelioma and whose only known exposure to asbestos was repeated exposure to cosmetic talcum powders." *Id.*

160.    MesotheliomaGuide.com has a page devoted to "Talc and Mesothelioma" which begins: "Johnson & Johnson is the brand most connected to asbestos in talc." Ex. H., *Talc and Mesothelioma*, MesotheliomaGuide.com.[18] It states: "A second study, which was published in the American Journal of Industrial Medicine, analyzed the connection between cosmetic talc and

---

[17] https://mesothelioma.net/mesothelioma-news/study-concludes-that-exposure-to-cosmetic-talc-can-lead-to-mesothelioma/

[18] https://www.mesotheliomaguide.com/mesothelioma/causes/talc-mesothelioma-from-asbestos-exposure/

mesothelioma. The researchers found 75 people whose only known asbestos exposure was from asbestos-contaminated talc." *Id.*

161.    The Law Offices of Kenneth A. Wilhelm cited the Emory Article, claiming that it "has strengthened the link between prolonged exposure to cosmetic talcum powder and a rare form of cancer called mesothelioma" while also advertising litigation concerning Johnson's Baby Powder. Ex. K., K. Wilhelm, *New Study Reinforces Link Between Talc and Mesothelioma*, Work4YouLaw.com (2020).[19]

162.    As a result, anyone reading, hearing, or otherwise receiving the Authors' false statements would have associated those statements with the Johnson's Baby Powder and Shower to Shower products.

163.    After the online publication of the Article, the Authors have been disclosed in dozens of cosmetic talc/mesothelioma cases against LLT, many of which are in New Jersey. The Authors routinely rely on their Article in these cases, including in the New Jersey cases. Moreover, in at least 41 cosmetic talc/mesothelioma cases against LLT, a combined 9 other plaintiff experts have relied on the Article in either their testimony or court disclosures.

164.    As a direct and proximate cause of the Authors' false statements, LLT has suffered, and continues to suffer, actual and special damages, including, without limitation, lost profits on the sale of Johnson's Baby Powder caused by the widespread dissemination of the Article; increased fees to defend (including substantial fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, and defend against the Authors' assertions) and resolve Talc Claims; and other expenses incurred to counteract and prevent the Authors' false statements

---

[19] https://www.work4youlaw.com/blog/new-study-reinforces-link-between-talc-and-mesothelioma/amp/

from causing further harm (including the costs of this litigation). LLT felt the brunt of this harm in New Jersey, where its principal place of business is located.

165.    The Authors knew or reasonably should have anticipated that their false statements and subsequent acts of concealment would cause the aforementioned actual and special damages to LLT.

### Count II: Fraud

166.    LLT hereby incorporates each preceding paragraph as though fully set forth herein.

167.    As alleged herein, the Authors' have made statements that contain false and untrue assertions of fact.

168.    The Authors' false statements were made with the knowledge that they were false and/or with reckless disregard as to their truth or falsity. Moreover, as described herein, the Authors have repeatedly sought to conceal evidence undermining the falsity of their statements and demonstrating the statements were made with knowledge that they were false and/or with reckless disregard as to their truth or falsity.

169.    The Authors acted without any privilege, authorization, or immunity when they published their false statements. The statements alleged herein are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying their Article.

170.    The Authors made the false statements alleged herein intending that they be relied upon by others, including by the public at large, consumers and manufacturers of cosmetic talc products, scientists, and attorneys and expert witnesses involved in talcum powder litigation, all of whom did reasonably and justifiably rely on the Authors' false statements.

171.    The Authors omitted from their publication that their statements regarding the lack of alternative exposures were false and that they knew they were false. In view of their affirmative

representations, the Authors had a duty to fully disclose such facts. The Authors instead actively concealed and thwarted LLT's efforts to discover the truth. As a result, LLT did not know and could not have known of the Authors' fraud until recently. LLT therefore made its business decisions and defense of Talc Claims, including but not limited to LLT's investigation of claims, approaches to settling such claims, retention of experts, and trial strategies—in reasonable and justifiable reliance on their fraudulent partial disclosures.

172.    As a direct and proximate cause of the Authors' false statements, LLT has suffered, and continues to suffer, actual and special damages, including, without limitation, lost profits on the sale of Johnson's Baby Powder caused by the widespread dissemination of the Article; increased fees to defend (including substantial fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, and defend against the Authors' assertions) and resolve Talc Claims; and other expenses incurred to counteract and prevent the Authors' false statements from causing further harm (including the costs of this litigation).

## Count III: Violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a)

173.    LLT hereby incorporates each preceding paragraph as though fully set forth herein.

174.    In connection with Johnson's Baby Powder and Shower to Shower and the services of the Authors, both of which are offered in interstate commerce, the Authors have made material, false, and misleading descriptions or representations of fact, as set forth above. The statements disparage and misrepresent the nature, characteristics, and qualities of Johnson's Baby Powder and Shower to Shower.

175.    In connection with Johnson's Baby Powder and Shower to Shower and the services of the Authors, both of which are offered in interstate commerce, the Authors have made material, false, and misleading omissions of fact, as set forth above, under circumstances where they had a

duty to speak. The omissions disparage and misrepresent the nature, characteristics, and qualities of Johnson's Baby Powder and Shower to Shower.

176.    The Authors' statements and omissions are literally false, expressly and/or by necessary implication. In the alternative, the Authors' statements have actually deceived, or have the tendency to deceive, a substantial portion of the intended audience.

177.    The Authors' statements and omissions concerned matters that are material to purchasing decisions and to other commercial decisions, including but not limited to the safety of Johnson's Baby Powder and Shower to Shower.

178.    The Authors' statements and omissions were made in commercial advertising, and therefore violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Authors made the statements and omissions with a commercial motive: namely, to promote services as testifying expert witnesses by making those services more desirable, gaining additional clients, and reaping additional compensation. The Authors' statements and omissions were widely circulated to the public nationwide as part of an organized effort to target a class or category of customers or potential customers.

179.    Although *mens rea* is not required to establish a Lanham Act violation, the Authors made these statements and omissions knowingly and willfully. In the alternative, the Authors made them with willful blindness and/or reckless disregard as to their truth or falsity.

180.    As a direct and proximate result of the deception caused by the Authors' statements and omissions, LLT has suffered, and will continue to suffer, loss of sales and customers, irreparable harm to its commercial reputation and goodwill, and other compensable damages. In addition, the Authors' statements and omissions resulted in the unjust enrichment of the Authors and/or their collaborators at LLT's expense.

**PRAYER FOR RELIEF**

WHEREFORE, LLT respectfully requests judgment or relief against the Authors as follows:

1)      Awarding special, compensatory, and punitive money damages to LLT against the Authors for injurious falsehood and product infringement;

2)      Awarding money damages (including punitive damages) to LLT against the Authors for fraud;

3)      Awarding money damages to LLT against the Authors for their violations of the Lanham Act;

4)      Enjoining the Authors from continuing to make false statements of the type alleged herein;

5)      Enjoining the Authors to answer questions regarding their Article that they have to date refused to answer;

6)      Enjoining the Authors to retract and/or issue a correction of their Article;

7)      Enjoining the Authors to produce unsealed records identifying the individuals in the Article;

8)      Awarding LLT the costs of this action, including attorneys' fees, together with pre- and post-judgment interest; and

9)      Awarding LLT such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

LLT respectfully requests a trial by jury on all triable issues in accordance with Fed. R. Civ. P. 38.

Dated: May 9, 2024                                      Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER &**               **MCGUIREWOODS LLP**
**FLOM LLP**

                                                        /s/ Benjamin L. Hatch
Allison M. Brown *(pro hac to be filed)*                Benjamin L. Hatch (VSB No. 77294)
One Manhattan West                                      World Trade Center
New York, New York 10001                                101 West Main Street, Suite 9000
Telephone: (212) 735-3222                               Norfolk, VA 23510-1655
Facsimile: (917) 777-3222                               Telephone: (757) 640-3727
Allison.Brown@skadden.com                               Facsimile: (757) 640-3947
                                                        bhatch@mcguirewoods.com

                                                        Samuel L. Tarry, Jr. (VSB No. 36850)
                                                        1750 Tysons Boulevard
                                                        Suite 1800
                                                        Tysons, VA 22102-4215
                                                        Telephone: (703) 712 5000
                                                        Facsimile: (703) 712 5050
                                                        starry@mcguirewoods.com

**KING & SPALDING, LLP**

Kristen Fournier
1185 Avenue of the Americas 34th Floor
New York, NY 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
kfournier@kslaw.com


                    *Counsel for Plaintiff LLT Management LLC*


40