**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. JACQUELINE MIRIAM MOLINE,

                             Plaintiff,

     v.

PECOS RIVER TALC LLC,

                            Defendant.

Civil Action No. 1:25-mc-00391-PAE

**OPPOSITION TO DR. JACQUELINE MIRIAM MOLINE'S MOTION TO QUASH
PECOS RIVER TALC LLC'S AUGUST 15, 2025 SUBPOENA**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .............................................................................................................. 5

I.       The Emory Article .......................................................................................... 5

II.      Coordination Between The Two Articles And Between The Simon Greenstone
         Firm ................................................................................................................ 8

III.     Pecos River's Trade Libel Claim And Subpoena To Dr. Moline ..................... 12

LEGAL STANDARD ..................................................................................................... 12

ARGUMENT ................................................................................................................ 13

I.       The Subpoena Seeks Relevant Information. .................................................. 13

         A.      The subpoena seeks relevant information regarding Dr. Emory's efforts to
                 ascertain any overlap of subjects between ......................................... 13

         B.      The subpoena seeks relevant information regarding coordination between
                 the Dr. Moline, Emory Authors, and Simon Greenstone. ................... 15

II.      This Subpoena Does Not Harass or Place an Undue Burden on Dr. Moline—a
         Professional Expert Witness. ......................................................................... 16

CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alex & Ani, Inc. v. MOA Int'l Corp.*,
  No. 10 Civ. 4590 (KMW), 2011 WL 6413612 (S.D.N.Y. Dec. 21, 2011)............................17

*Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*,
  No. 20 MISC. 23, 2020 WL 4700910 (S.D.N.Y. Aug. 13, 2020) ....................................21, 22

*Bell v. Am. Int'l Indus.*,
  627 F. Supp. 3d 520 (M.D.N.C. 2022) .................................................................................15

*Fong & Wong v. Johnson & Johnson, et al.*,
  No. BC–675449 (Cali. Sup. Ct. Oct. 29, 2019) ....................................................................20

*Hughes v. Twenty-First Century Fox, Inc.*,
  327 F.R.D. 55 (S.D.N.Y. 2018) ............................................................................................17

*LLT Mgmt. LLC v. Emory*,
  766 F. Supp. 3d 576 (E.D. Va. 2025) ............................................................................ *passim*

*Mark Anthony Int'l SRL v. Prime Hydration, LLC*,
  No. 24 CIV. 7620 (PAE), 2025 WL 2055998 (S.D.N.Y. July 23, 2025) ..............................21

*Ohio Dept. of Insurance v. RPM Mortgage, Inc., et al.*,
  No. 20 MISC. 590 (PAE), 2020 WL 8513150 (S.D.N.Y. Dec. 2, 2020) (J.
  Engelmayer)...............................................................................................................16, 17, 21

*Scott v. Chipotle Mexican Grill, Inc.*,
  306 F.R.D. 120 (S.D.N.Y. 2015) ..........................................................................................21

*Trilegiant Corp. v. Sitel Corp.*,
  272 F.R.D. 360 (S.D.N.Y. 2010) ..........................................................................................17

*U.S. Bank Trust Company, National Association, as Trustee for the Benefit of the
  Certificateholders of Natixis Commercial Mortgage Securities Trust 2022-
  JERI v. Jericho Plaza Portfolio LLC et al.*,
  1:24-CV-00917, 2024 WL 5089639 (S.D.N.Y. Dec. 12, 2024) (J.
  Engelmayer)..........................................................................................................................21

**Rules**

Fed. R. Civ. P. 26(b)(1)..............................................................................................................16

Fed. R. Civ. P. 45(c)(iii), (iv)......................................................................................................16

Pecos River Talc LLC ("Pecos River") submits this Opposition to Dr. Jacqueline Miriam Moline's ("Dr. Moline") Motion to Quash Pecos River's August 15, 2025 Subpoena.

## PRELIMINARY STATEMENT

Dr. Theresa Emory, Dr. John Maddox, and Dr. Richard Kradin are all plaintiffs' experts in cosmetic talc litigation who authored an article regarding cosmetic talc entitled *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients* (the "Emory Article" or the "Article"). The Article concerns 75 subjects who were all plaintiffs in litigation who developed mesothelioma. The central premise of the Article is that for all 75 subjects, their "only known exposure to asbestos was repeated exposures to cosmetic talcum powders," necessarily pointing the finger at cosmetic talc. Ex. 1, Emory Article at 1. That statement is false. The Article's authors now admit that multiple subjects of the Article were exposed to asbestos from non-talc sources.

That Emory Article also falsely claims that all of its subjects were "additional" to the subjects of Dr. Moline's similar false paper. *Id.* at 2. That statement is not true as well. Dr. Emory, Dr. Maddox, and Dr. Kradin now also admit that an overlap exists between the subjects of the two papers.

Pecos River—an indirect subsidiary of Johnson & Johnson—has responsibility for claims related to allegations that its talc powder products, including Johnson's Baby Powder, supposedly contain asbestos and cause mesothelioma. Pecos River filed a trade libel claim against the authors of the Emory Article in the Eastern District of Virginia based on the Article's false statements. The Eastern District of Virginia Court stated that Pecos River must demonstrate "actual malice"—that the statements in the Article were knowingly or recklessly false. Because it is now undisputed that the subjects did overlap, the knowing-or-reckless-disregard element has moved front and center. That means that the process the Emory Article authors used to attempt to ascertain any overlap

1

between the subjects of their Article and the subjects of Dr. Moline's similar paper is critical to the Pecos River's claim, including the conversations that occurred with Dr. Moline.

Dr. Moline chiefly argues that a deposition of her is unnecessary because she already testified that she did not "have any communications with Dr. Emory, Dr. Maddox or Dr. Kradin regarding" Dr. Moline's paper. Mot. at 14 (quoting Mot. Ex. 11, 7/14/25 Moline Dep. Tr. at 235:12-236:12). But that testimony was simply not true, as proven by documents produced in the *Emory* case.

Dr. Emory emailed Dr. Moline to discuss the potential for overlap of the subjects of Dr. Moline's paper, and Dr. Moline set up a call for the next morning.

| | |
|---|---|
| **From:** | "Moline, Jacqueline" <JMoline@northwell.edu> |
| **Sent:** | Thu, 13 Feb 2020 21:47:22 -0500 (EST) |
| **To:** | "Theresa Emory" <temorymd@gmail.com> |
| **Subject:** | Re: [EXTERNAL] Query |

please give me a ring tomorrow

**From:** Theresa Emory <temorymd@gmail.com>
**Sent:** Thursday, February 13, 2020 1:03 PM
**To:** Moline, Jacqueline <JMoline@northwell.edu>
**Subject:** [EXTERNAL] Query

*External Email. Use Caution.*
Dr. Moline,

I am working with John Maddox and Richard Kradin on a study.

Before we submit for publication, I want to make sure that a few of the cases have not already been published by you.

If possible, I would appreciate the opportunity to discuss this with you.

Ex. 2, Feb. 13, 2020 Email Chain.

The two obviously discussed the subjects of their cases because on the morning of the phone call, Dr. Emory removed four cases for her Article due to an overlap with Dr. Moline's paper:

| From: | "Theresa Emory" <temorymd@gmail.com> |
| Sent: | Fri, 14 Feb 2020 11:03:08 -0500 (EST) |
| To: | "Dr. John Maddox" <jcm73773@msn.com>; "Richard Kradin" <richardkradin@googlemail.com> |
| Subject: | Study number 75 cases |

I am removing 4 cases from the study because they have already been reported.

The final number will be 75 cases.

I will get back with the data and tables and the next draft ASAP.
Thanks-
Theresa

Ex. 3, Feb 14, 2020 Email. What did they discuss? How did Dr. Emory know to remove those four cases but miss eight others? That is information Dr. Moline knows and Pecos River does not.

Dr. Moline also points out that she testified that she did not have "any communications with either Dr. Maddox, Dr. Emory or Dr. Kradin regarding *their article* regarding the 75 individuals." Mot. at 14 (quoting Mot. Ex. 11, 7/14/25 Moline Dep. Tr. at 235:12–236:12) (emphasis added). That too is disproven by the documents. As just one example, Dr. Kradin and Dr. Moline spoke on the phone shortly after Dr. Moline's paper came out:

| From: | Richard Kradin <richardkradin@googlemail.com> |
| Sent: | Wed, 23 Oct 2019 14:20:43 -0400 (EDT) |
| To: | John Maddox <jcm73773@msn.com> |
| Subject: | Talc |
| Attachments: | Meso Associated with the Use of Cosmetic Talc, Article.pdf |

John:
I'm enclosIng the Moline article. I spoke with her and she encouraged us to submit our article asap. Let me know when you have another draft.
Rich

Ex. 4, Oct. 23, 2019 Email. Dr. Moline plainly has information regarding her interactions with the authors of the Emory Article that are relevant to Pecos River's claim.

Yet despite all these emails, Dr. Moline applauds her own efforts to "search for documents and communications relating to interactions with the Emory Authors about the Emory Article" which somehow "yielded no responsive documents." Mot. at 14. Given all these emails, it is not credible that Dr. Moline's search possibly could have found absolutely nothing. Dr. Moline therefore also has information regarding her email and document retention that would assist in the document request portion of Pecos River's subpoena.

Dr. Moline has even more information as well. Discovery in the *Emory* case has demonstrated that Dr. Moline and Dr. Emory's papers were coordinated by the plaintiffs' firm, Simon Greenstone Panatier. Simon Greenstone provided subjects for inclusion in the Emory Article and provided information to the Emory Article's authors over the course of the Article's preparation. Despite claiming all the identities of the Emory Article's subjects were confidential, Dr. Emory sent *all* their identities to Simon Greenstone attorneys. An attorney from Simon Greenstone also told Dr. Maddox about the substance of Dr. Moline's paper *before* Dr. Moline's paper ever became publicly available. At around this same time, the authors of the Emory Article changed the language of their Article in a draft to state that their subjects' "only known exposure to asbestos" was cosmetic talc—matching the key language of Dr. Moline's paper almost exactly. When Dr. Emory initially attempted to determine whether the subjects of her Article overlapped with Dr. Moline's, she first reached out to attorneys at Simon Greenstone—asking them to figure it out. Dr. Moline has knowledge regarding these coordination efforts.

Finally, a deposition is no burden on Dr. Moline. She is a professional expert witness who has been testifying in asbestos litigation for decades. She testifies in asbestos cases approximately once a month. Her conclusory argument that she will be burdened by one more deposition does not pass muster.

The *Emory* case is on an accelerated schedule, as is typical in the Eastern District of Virginia. Summary judgment motions for this phase of discovery are due October 17. This Court should deny Dr. Moline's motion to quash and order that her deposition go forward expeditiously.

## BACKGROUND

### I.    The Emory Article

Pecos River is seeking discovery in a case in the Eastern District of Virginia concerning the Emory Article: *Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patient*. The Article was written by three experts in cosmetic talc litigation, Dr. Theresa Emory, Dr. John Maddox, and Dr. Richard Kradin (the "Emory Authors").

The Article concerns 75 individuals with mesothelioma, all of whom are plaintiffs in cosmetic talc litigation. For the vast majority of the subjects, one of the authors served as the expert witness in the subjects' underlying case. When the authors were preparing the Article, they expected to rely on it in litigation. Ex. 5, Maddox *Emory* Dep. at 163:3–167:18.; Ex. 6, Kradin *Emory* Dep. at 134:3–7.

The Article states that for all 75 subjects, their "only known exposure to asbestos" was cosmetic talc. Ex. 1, Emory Article at 2. The Article goes on to state that these exposures were assessed by reviewing "sworn deposition testimonies and answers to sworn interrogatories." *Id.* And the Article also states that all of its subjects were "additional" to the subjects in a similar paper authored by Dr. Moline, movant here. All three of these statements are false.

*"Only Known Exposure."* The Emory Article's central premise—that the 75 subjects had no other exposures to asbestos—is indisputably false. The Emory Authors now admit that a number of the subjects of their Article were in fact exposed to asbestos from non-talc sources. Ex.7, Kradin Aug. 08, 2025 Amended and Supplemental Responses to Third Set of Interrogatories

at 4.[1] Indeed, for many, the Emory Authors stated in the subjects' underlying cases where the authors served as experts that these non-talc exposures occurred. While the identities of the subjects of the Emory Article were anonymized, they were provided to Pecos River in discovery in the underlying lawsuit under a protective order.

For example, for Case #8, Dr. Kradin wrote in his own expert report that Case #8 was exposed to asbestos from smoking a type of cigarette with asbestos in the filter. Ex 6, Kradin *Emory* Dep. at 164:20–166:3. For Case #24, Dr. Maddox testified in his deposition in the subject's underlying case that the subject was exposed to asbestos from joint compound. Ex. 11, Maddox *Case #24* Dep. at 54:10–55:1. Discovery has uncovered many more examples of subjects with these sorts of non-talc exposures. Dr. Kradin's wife and administrative assistant who was responsible for reviewing Dr. Kradin's reports for purposes of preparing the Article admitted that the Article's central premise was "untrue" and that a correction should be issued. Ex. 12, Cashman *Emory* Dep., at 122:2–12. Dr. Maddox admitted that even when records he reviewed identified non-talc exposures to asbestos, he included the subject in the Article if he determined that the exposure was not "significant" based on an evaluation of six factors mentioned nowhere in the Article. Ex 5, Maddox *Emory* Dep. at 42:6–44:17.

***Review of Deposition Transcripts and Interrogatories***. It is also not true that the Emory Authors reviewed deposition transcripts and interrogatories, as stated in their Article. Dr. Kradin asked his wife/administrative assistant to review his expert reports with no further instructions. Ex, 9, Cashman *Emory* Dep. at 124:4–15. In fact, she only reviewed one section of Dr. Kradin's

---

[1]    *See also* Ex. 8, at 5, T. Emory Jul. 25, 2025 Response to Requests for Admissions ("Defendant admits that one or more of the Study Participants was exposed to asbestos from a source or sources other than talc"); Ex. 9, at 5, J. Maddox July 25, 2025 Responses to Requests for Admissions (same); Ex. 10, at 5, R. Kradin July 25, 2025 Responses to Requests for Admissions (same).

expert reports and did not review any underlying case materials. *Id.* at 52:10–18. Dr. Maddox reviewed his expert reports and only if there was an ambiguity on the face of his report would he review other documents. Ex. 5, Maddox *Emory* Dep. 239:8–241:13. In many instances, his report relies exclusively on summaries provided by plaintiffs' counsel and not deposition transcripts, interrogatory responses, or any actual evidence. *Id.* at 54:11–55:14. In fact, Dr. Maddox stated in internal emails that the Article should state that he and his co-authors also relied on "concise statements of exposures received from attorneys" but that language was cut from the final Article. *Id.* at 138:2–16.

**Subjects "Additional." To Dr. Moline's Paper**. Central to Dr. Moline's motion before this Court is the statement in the Emory Article that all the subjects were "additional" to Dr. Moline's paper. Dr. Moline is also an expert in cosmetic talc litigation. Before the Emory Article was published, Dr. Moline had authored a similar paper regarding 33 plaintiffs. That paper also falsely claimed that its subjects have no other exposures to asbestos other than talc. Yet it has now come to light that numerous individuals in Dr. Moline's paper also had other exposures to asbestos. The authors of the Emory Article now admit that there is overlap between the subjects of the two papers, despite the Emory Article claiming otherwise. Ex. 8, at 9, Emory July 25, 2025 Responses to Requests for Admissions. In fact, eight of the subjects overlap. *See* Bush Decl. ¶ 1.

Dr. Emory set up a call with Dr. Moline to discuss the potential overlap between the subjects of the two papers. Ex. 2, Feb. 13, 2020 Email. After the call, Dr. Emory removed four subjects from her Article because they were also subjects of Dr. Moline's paper. Ex. 3, Feb. 14, 2020 Email. Dr. Moline has knowledge of that conversation that represents a critical component of the *Emory* case.

Dr. Moline also produced no documents in response to Pecos River's subpoena. She stated that she did not have any communications with the authors of the Emory Article in her possession despite numerous emails between them. *See* Mot. Ex. 4. Dr. Moline therefore also has information regarding how her emails are stored and maintained such that she has no responsive documents in her possession.

## II.    Coordination Between The Two Articles And Between The Simon Greenstone Firm

The evidence that has emerged from the *Emory* case demonstrates not only that Dr. Emory, Dr. Maddox, and Dr. Kradin coordinated with Dr. Moline, but that that the two articles were orchestrated by the law firm Simon Greenstone Panatier, which represents plaintiffs in asbestos litigation.

Early in the preparation of the Article, Leah Kagan from Simon Greenstone emailed Dr. Maddox an initial set of cases for him to include in his Article, pursuant to his request. Ex. 33, Apr. 10, 2019 Email. Dr. Maddox then requested additional cases two months later, which Ms. Kagan again provided. *Id.* at 1. Throughout the process, attorneys from Simon Greenstone fielded questions from Dr. Maddox and Dr. Emory regarding subjects of the Article. Ex. 5, Maddox *Emory* Dep. at 23:9–26:21.

Dr. Moline's paper became available online on October 10, 2019. Ex. 16, Dec. 10, 2019 Written Testimony of Jacqueline Moline, U.S. House of Representatives at 2 n.3. Yet months before that in August 2019, Chris Panatier of Simon Greenstone informed Dr. Maddox that Dr. Moline submitted her paper. Ex. 15, Aug. 10, 2019 Email. At around the same time, Dr. Kradin changed the critical language of a draft the Emory Article. The Article previously stated that the subjects were exposed asbestos from talc "either solely ***or predominantly***." Ex. 18, Kradin Redline (emphasis added); *see also* Ex. 17, July 31, 2019 Email. But Dr. Kradin deleted that language and replaced it with the statement that the subjects "***only known exposure to asbestos***" was via

cosmetic talc. Ex. 18 (emphasis added). This language is nearly identical to that of Dr. Moline's at-the-time-unpublished paper which states her subjects had "***no known asbestos exposure*** other than cosmetic talc." Ex. 28, Moline Article at 11.

One month later in September 2019—still before Dr. Moline's paper was public—Dr. Kradin and Dr. Maddox discussed the potential overlap between the subjects of their Article and the subjects of Dr. Moline's paper. *See* Ex. 19, Sept. 01, 2019 Email.[2] The reason Dr. Maddox knew that Dr. Moline would be writing a paper with talc plaintiffs as the paper's subjects was because Mr. Panatier from Simon Greenstone told him. Ex. 5, Maddox *Emory* Dep. at 103:20–25.

Three days before Dr. Moline's paper was published, Dr. Maddox wrote on October 7, 2019 that he understood the Dr. Moline's was to be published in the Journal of Occupational and Environmental Medicine that week. Ex. 20, Oct. 7, 2019 Email. After then the paper became available online, Dr. Kradin wrote to Dr. Moline telling her: "We have all been waiting for it so congratulations are in order!" Ex. 21, Oct. 22, 2019 Email. Dr. Kradin then spoke to Dr. Moline who "encouraged [him] to submit our article asap." Ex. 4, Oct. 23, 2019 Email.

A few months later when Dr. Emory was attempting to determine if the subjects of her Article overlapped with the subjects of Dr. Moline's, she enlisted Simon Greenstone's help: "I have SGP trying to help ensure that the Moline cases are not overlapping ours." Ex. 22, Feb. 11, 2020 Email. Although Dr. Emory has repeatedly claimed the identities of the subjects of her Article are confidential, she in fact sent the names of *all* the subjects to Simon Greenstone. Ex. 23, Feb. 10, 2020 Email.

Critically, Dr. Emory and Dr. Moline have both maintained that they never spoke to each other regarding any overlap in the subjects of their papers. Ex. 24, Moline *Clark* Dep. at 235:12–

---

[2]     The email refers to "Gordon" who is a co-author of Dr. Moline's article.

9

236:12; Ex. 25, Emory *Zimmerman* Dep. at 308:19–21. But the documents have disproven that testimony. On February 12, 2020, attorneys from Simon Greenstone informed Dr. Emory that they would speak to Dr. Moline about the issue of the overlap in papers' subjects. Ex. 26, Feb. 12, 2020 Email. Simon Greenstone then arranged for the two experts to discuss the issue. The next day Dr. Emory emailed Dr. Moline directly to discuss the potential for overlap of the subjects of Dr. Moline's article. Dr. Emory wrote: "I want to make sure that a few of the cases have not already been published by you." Ex. 2, Feb. 13, 2020 Email Chain. Dr. Moline set up a call for the next morning (February 14). *Id.*

There can be no dispute the two discussed the subjects of their cases because on 11am on the day of their February 14 call, Dr. Emory informed her co-authors that she was removing four cases from their Article due to an overlap with Dr. Moline's paper. Ex. 3, Feb. 14, 2020 Email. Later, Dr. Moline also provided Dr. Emory with advice regarding the citations in the Emory Article. Ex. 27, Feb. 29, 2020 Email Chain.

And Dr. Moline's paper was not the only talc paper published by plaintiffs' experts in talc litigation in this timeframe. That paper authored by Dr. Moline and Dr. Gordon (both plaintiffs' experts in cosmetic talc litigation) was a case series that was formally published as article Number 1 in Volume 62 of the Journal of Occupational and Environmental Medicine. Ex. 28, Moline Article at 14. Article Number 2 of the same Volume of the same Journal was *another* case series also written by three plaintiffs' experts in cosmetic talc litigation (Dr. Longo, Dr. Rigler, and Dr. Egilman) and others who work for Dr. Egilman. Ex. 29, Joan E. Steffen, et al., *Serous Ovarian Cancer Caused by Exposure to Asbestos and Fibrous Talc in Cosmetic Talc Powders—A Case Series*, 62 JOEM 65, 65 (Feb. 2020). When Mr. Panatier told Dr. Maddox that Dr. Moline had submitted a paper, he also mentioned a paper from "Longo." Ex. 19, Sept. 01, 2019 Email. Dr.

Emory, Dr. Maddox, and Dr. Kradin's case series was published the next month, bringing the total up to eight plaintiffs' experts authoring articles in this time period. Dr. Kradin implausibly claimed that it was just "coincidence" that "three articles that are all case series all about cosmetic talcum powder all authored by experts for the plaintiffs in cosmetic talc litigation came out in a close period of time in the same year." Ex. 6, Kradin *Emory* Dep. at 96:16–21.

Later, another talc manufacturer learned through a subpoena that one of the subjects of Dr. Moline's article was Betty Bell. Even though Dr. Moline had claimed in her paper that "[n]o individual identified any asbestos exposure apart from contaminated talcum powder," Ex. 28, Moline Article at 14, Ms. Bell had in fact "filed workers' compensation claims with the North Carolina Industrial Commission, asserting that she was exposed to asbestos during prior employment with two textile employers." *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 524 (M.D.N.C. 2022). The court for the Middle District of North Carolina "expressed concern about this seeming contradiction before and d[id] so again." *Id.* at 530 (internal citations omitted). When the other talc manufacturer obtained Ms. Bell's identity from Northwell Health (Dr. Moline's employer), an attorney from Simon Greenstone threatened the talc defendant's counsel that she would "immediately report you and your firm." Ex. 30, Sept. 11–12 Email Chain. She then threatened to report Northwell's attorney to both the Department on Health and Human Services and his state bar. Ex. 31, Sept. 12, 2020 Email.

In the underlying *Emory* case, Dr. Maddox was instructed not to answer if anyone was funding the defense of Pecos River's lawsuit against him and his co-authors. Ex. 5, Maddox *Emory* Dep. at 15:25–18:2. Yet he did testify that he hopes that Simon Greenstone will pay for any damages assessed against him in the event he is found liable. *Id.* at 20:22–25.

### III.    Pecos River's Trade Libel Claim And Subpoena To Dr. Moline

Because of Dr. Moline's communications with the Emory Authors and the overall coordination between Dr. Moline, the Emory Authors, and Simon Greenstone, Pecos River subpoenaed Dr. Moline for documents and for a deposition.

Broadly speaking, Pecos River requested documents and communications between Dr. Moline and (1) Emory Authors, (2) the authors of the Steffen[3] paper; and (3) plaintiffs attorneys regarding the "genesis, development, preparation, drafting, or submission" of the Emory Article, Dr. Moline's paper, and the Steffen paper.  Ex. 32, August 15, 2025 subpoena served by Pecos River Talc LLC on Dr. Moline. Dr. Moline stated that she had no documents in her possession and opposed a deposition *See* Mot. Ex. 4. The *Emory* case is proceeding on an accelerated schedule and summary judgment motions are due October 17, 2025 for the current phase of discovery.

### LEGAL STANDARD

"[P]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *Ohio Dept. of Insurance v. RPM Mortgage, Inc., et al.*, No. 20 MISC. 590 (PAE), 2020 WL 8513150, at *1 (S.D.N.Y. Dec. 2, 2020) (J. Engelmayer) (quoting Fed. R. Civ. P. 26(b)(1). "The Federal Rules of Civil Procedure direct the Court to quash or modify subpoenas only in limited circumstances, such as where the subpoena 'requires disclosure of privileged or other protected matter' or 'subjects a person to undue burden.'" *Id.* (quoting Fed. R. Civ. P. 45(c)(iii), (iv)). "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." *Id.* (quoting *Trilegiant Corp. v. Sitel Corp.*, 272 F.R.D. 360, 363 (S.D.N.Y. 2010)). "Once the issuing party demonstrates relevance, '[t]he movant bears the burden

---

[3]    The Steffen paper is the other paper that was published in this same timeframe co-authored by Dr. Longo, Dr. Rigler, and Dr. Egilman.

of persuasion in a motion to quash a non-party subpoena.'" *Id.* at 2 (quoting *Hughes v. Twenty-First Century Fox, Inc.*, 327 F.R.D. 55, 57 (S.D.N.Y. 2018)).

## ARGUMENT

### I.      The Subpoena Seeks Relevant Information.

To survive a motion to quash, "the party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Id.* at 2 (quoting *Alex & Ani, Inc. v. MOA Int'l Corp.*, No. 10 Civ. 4590 (KMW), 2011 WL 6413612, at *3 (S.D.N.Y. Dec. 21, 2011)). Deposing Dr. Moline is relevant to: (A) Emory Authors' efforts to determine the overlap between the subjects of their Article and Dr. Moline's paper; and (B) the overall coordination between the Emory Authors, Dr. Moline, and Simon Greenstone in the creation of the Emory Article, Dr. Moline's paper, and Dr. Longo's paper.

### A.      The subpoena seeks relevant information regarding Dr. Emory's efforts to ascertain any overlap of subjects between

The *Emory* Court set out that Pecos River must show that the Emory Authors' false statements were made "with malice" as an element of its trade libel claim. *LLT Mgmt. LLC v. Emory*, 766 F. Supp. 3d 576, 599 (E.D. Va. 2025).[4] That Court explained that the "actual-malice standard requires proof that the defamatory statement was published with knowledge that it was false or with reckless disregard of its truth or falsity." *Id.* at 599 n.11.

The *Emory* Court permitted Pecos River to proceed with its claim that one component of the Emory Article's falsity is its statement that all of its subjects are "additional" to Dr. Moline's subjects. *Id.* at 588 ("The article claimed to 'present 75 [ ] subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc,' who were 'additional' to 33 subjects

---

[4]      Pecos River Talc LLC was later substituted as plaintiff for LLT Management LLC.

discussed in an earlier study. Both components of that statement were false.") (internal citations omitted); *see also id.* at 601 ("[T]the defendants' assertion that the subjects of their study were 'additional' to the subjects in the previous study is certainly verifiable. Therefore, the Court finds that the Complaint adequately pleads the verifiability requirement under Count I.").

It is now undisputed that the statement is untrue. The Emory Authors' reckless disregard for the truth when making that false statement is therefore at the center of the case. The content of the Emory Authors' communications with Dr. Moline to investigate the statement is critical evidence regarding reckless disregard. Dr. Moline does not truly dispute relevance in her motion. Rather, she mainly argues that she already testified that she had no communications with the Emory Authors regarding either their Article or her own paper. Mot. at 13–14. But as discussed extensively above, that is demonstrably untrue. They had multiple conversations.

Dr. Moline then pivots to claim that her testimony is "consistent with Dr. Emory's sworn interrogatory response in the Emory Action, in which she stated that during a brief telephone conversation, Dr. Moline refused to discuss the subjects in the Moline Article." Mot. 14. As an initial matter, Dr. Moline's testimony that she had "no communications" with Dr. Emory is ***not*** consistent with Dr. Emory's interrogatory response that they indeed had a "brief conversation." Second, ***both*** versions of events are inconsistent with the evidence. Immediately after Dr. Emory and Dr. Moline's phone call, Dr. Emory removed four subjects from her Article due to an overlap with Dr. Moline. Ex. 2, Feb. 13, 2020 Email Chain; Ex. 3, Feb. 14, 2020 Email. Plainly the two engaged in a substantive discussion of the subjects. They are simply attempting to conceal it.

Dr. Moline also touts how she undertook a "reasonable search for documents and communications" and "confirmed that her search yielded no responsive documents." Mot. at 14. Given that numerous emails were sent in between Dr. Moline and the Emory Authors, Dr. Moline

can also provide further testimony to explain how it is possible no responsive documents were found which would serve to aid Pecos River's document requests. This is particularly important because Dr. Kradin suspiciously deletes all his emails immediately after they are sent or received as a matter of practice. Ex. 6, Kradin *Emory* Dep. at 120:19–121:21.

Finally, Dr. Moline brazenly claims that any "deposition can only confirm what it already knows—that Dr. Moline did not communicate with the Emory Authors about their article or the Moline Article." Mot. at 14. The truth is Pecos River and Dr. Moline both know those communications did indeed occur. But Pecos River does not know the details because Dr. Emory and Dr. Moline have been concealing them for years.

In short, deposing Dr. Moline has information directly relevant to the central issue of the Emory Authors' reckless disregard for the truth. A deposition of her is therefore warranted.

### B. The subpoena seeks relevant information regarding coordination between the Dr. Moline, Emory Authors, and Simon Greenstone.

As part of their defense, the Emory Authors have maintained that their decision to write their Article had nothing to do with their work as experts in cosmetic talc litigation. Ex. 6, Kradin *Emory* Dep. at 133:19-24; Ex. 36, Feb 19, 2025 Emory Decl. at ¶ 7; Ex. 8, Emory' Supp. Responses to Plaintiff's RFAs at 6.

But in ruling on the Emory Authors' motion to dismiss, the *Emory* Court explained that Pecos River alleged that "the defendants intended to contribute to a body of literature manufactured to be presented in court." *LLT Mgmt. LLC*, 766 F. Supp. at 588. The *Emory* Court also explained that Pecos River "plausibly alleges that the defendants' intended and actual audience was the plaintiffs' bar, rather than the scientific community." *Id.* And the *Emory* Court found it relevant at the pleading stage that the relevant facts "pre-existed the scientific process the article describes— in fact, they were discovered through litigation, not through any scientific method." *Id.* at 601.

The way in which the Emory Article was created part of a coordinated litigation effort is therefore relevant to Pecos River's claim.

It is not plausible that eight separate plaintiffs' experts in cosmetic talc litigation all independently and organically prepared three separate articles that are all case series, all about cosmetic talc, and all published in early 2020. And the evidence shows it was not organic, as outlined extensively above. Critically, before Dr. Moline's Article was even public, Dr. Maddox heard from a Simon Greenstone attorney not just that Dr. Moline's article was submitted to the journal, but also the substance of that Article. And before Dr. Moline's paper was ever published, the Emory Authors' adjusted their Article's central premise to match the language of Dr. Moline's paper nearly exactly.

Dr. Moline has information regarding these coordination efforts that could serve to disprove the Emory Authors' assertions that they prepared their Article for purely altruistic purposes divorced from litigation, which is relevant to the overall context of the case, their motive to recklessly disregard the truth, and also to show that the statements are actionable.

## II.    This Subpoena Does Not Harass or Place an Undue Burden on Dr. Moline—a Professional Expert Witness.

The subpoena is not designed to harass Dr. Moline and would not impose an undue burden on her. Dr. Moline is a professional expert witness. She has been testifying for 25 years as an expert in asbestos litigation, earning her over $5 million. Ex. 24, Clark *Emory* Dep. at 16:25–17:21. Approximately 40 percent of her income comes from her expert litigation work. Ex. 34, Moline *Fong* Tr. 55:1-13. She testifies in asbestos cases approximately once a month. *Id.* at 54:23–25.

Dr. Moline's claimed undue burden not only flies in the face of her extensive work as an expert witness, it is also conclusory. As this Court has noted, stating "in conclusory fashion, that

the deposition would be 'unduly burdensome' and 'harassment'" is "not persuasive." *U.S. Bank Trust Company, National Association, as Trustee for the Benefit of the Certificateholders of Natixis Commercial Mortgage Securities Trust 2022- JERI v. Jericho Plaza Portfolio LLC et al.*, 1:24-CV-00917, 2024 WL 5089639, at *2–3 (S.D.N.Y. Dec. 12, 2024) (J. Engelmayer); *see also Ohio Dept. of Insurance*, 2020 WL 8513150 at *7–8 (collecting cases that reject undue burden arguments for being conclusory).

Here, Dr. Moline merely provides a string cite of boiler-plate examples where courts have found undue burden that upon any more than a cursory review show to be far different from the present case. For example, Dr. Moline relies on *Mark Anthony Int'l SRL v. Prime Hydration, LLC*, No. 24 CIV. 7620 (PAE), 2025 WL 2055998 (S.D.N.Y. July 23, 2025). There, the court found that a subpoena of world-famous soccer player Lionel Andrés Messi should be quashed under the apex doctrine that protects high-profile individuals from unnecessary depositions. Dr. Moline is not Messi. And she is not protected under the apex doctrine[5]—nor does she claim to be in her motion.

Dr. Moline also relies on *Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, No. 20 MISC. 23, 2020 WL 4700910 (S.D.N.Y. Aug. 13, 2020) for support. But she makes no mention that the subpoena in that case was "facially defective on at least two grounds." *Id.* at 2. This subpoena is not. Nor does Dr. Moline claim it to be. And as a part of the *Angelo, Gordon & Co., L.P.* court's undue burden analysis, it found that the issuing party waited until four days before the

---

[5]    "Courts have recognized an additional layer of protection for senior corporate executives subject to depositions." *Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015). Under the apex doctrine, "[t]he Court considers the likelihood that the individual possesses relevant knowledge, whether another source could provide identical information, the possibility of harassment, and the potential disruption of business." *Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015).

hearing to serve the deponent, missed the court's initial deadline to respond, then missed the extended deadline to respond. *Id.* at 3. None of this has happened here.

Finally, Dr. Moline asserts that the subpoena is harassment because Dr. Moline "has repeatedly affirmed she has no relevant knowledge regarding the Emory Article [so the deposition] can only be explained as an attempt to harass her." Mot. at 16. But as discussed above, she does have knowledge about the Emory Article and her testimony regarding no communications with the Emory Authors was simply untrue. *See supra* Section II. Further, when Dr. Moline was briefly asked three questions about the Emory Article during her previous deposition, plaintiffs' counsel interposed a lengthy scope objection arguing the questions were "completely outside the scope of what the subpoena's supposed to be about" and describing the questioning as "a back-dooring that I haven't seen in a while." Ex. 24, Moline *Clark* Dep. at 235:12–236:7. This deposition permits Pecos River to ask questions relevant to the *Emory* case without objection.

## CONCLUSION

This Court should deny Dr. Moline's motion to quash and order that her deposition go forward.

Dated: September 25, 2025                           Respectfully submitted,


**KIRKLAND & ELLIS LLP**


By:    _/s/ Matthew L. Bush_
       Kristen Fournier
       Matthew L. Bush
       601 Lexington Avenue
       New York, NY 10022
       T: (212) 446-4800
       F: (212) 446-4800
       kristen.fournier@kirkland.com
       matthew.bush@kirkland.com

## CERTIFICATE OF COMPLIANCE

In accordance with Local Civil Rule 7.1(c), I hereby certify that this motion contains 5,419 words in compliance with the word-count limitation set forth in that provision.

Dated: September 25, 2025                    */s/ Matthew L. Bush*
                                                   Matthew L. Bush