# **EXHIBIT 5**

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF VIRGINIA
 3                NEWPORT NEWS DIVISION
 4
 5
 6   - - - - - - - - - - - - - - -x
 7   PECOS RIVER TALC LLC,          :
 8          Plaintiff,               :   Civil Action Number
 9      vs.                          :   4:24-cv-75
10   DR. THERESA SWAIN EMORY, DR.   :
11   RICHARD LAWRENCE KRADIN, AND   :
12   DR. JOHN COULTER MADDOX,        :
13          Defendants.              :
14   - - - - - - - - - - - - - - -x
15
16            DEPOSITION OF JOHN C. MADDOX
17
18
19                        Washington, DC
20                        Friday, September 19, 2025
21
22
23   REPORTED BY:
24      CARMEN SMITH
25
```

| | Page 10 |
|---|---|
| 1 | E X H I B I T S (Continued) |
| 2 | EXHIBIT NUMBER                              IDENTIFIED |
| 3 | Maddox Exhibit 53 - Maddox deposition in |
| 4 | ▮Case No. 24▮'s case                             257 |
| 5 | Maddox Exhibit 54 - Maddox report in ▮Case No. |
| 6 | 43▮'s case, electronic signature 11/6/19    262 |
| 7 | Maddox Exhibit 55 - medical record from ▮Case |
| 8 | No. 43▮s case, visit date is 5/11/2018       267 |
| 9 | Maddox Exhibit 56 - Maddox report in ▮Case |
| 10 | No. 67▮'s case, 5/31/2019 for his signature   273 |
| 11 | Maddox Exhibit 57 - plaintiffs responses to |
| 12 | master discovery and request for production |
| 13 | of documents in ▮Case No. 67▮'s case          276 |
| 14 | Maddox Exhibit 58 - Maddox report in ▮Case |
| 15 | No. 58▮'s case, 1/31/19 for his signature     279 |
| 16 | Maddox Exhibit 59 - affidavit of ▮▮▮▮▮ |
| 17 | ▮▮▮▮▮ dated July 24, 2018                      280 |
| 18 | Maddox Exhibit 60 - Maddox report in ▮Case No. |
| 19 | 68▮s case, 2/5/2018 for his signature         286 |
| 20 | Maddox Exhibit 61 - 6/25/19 Maddox deposition |
| 21 | in ▮Case No. 68▮'s case                       287 |
| 22 | Maddox Exhibit 62 - 7/2/19 Maddox deposition |
| 23 | in ▮Case No. 68▮s case                        288 |
| 24 | |
| 25 |                          -- continued -- |

| | Page 11 |
|---|---|
| 1 | E X H I B I T S (Continued) |
| 2 | EXHIBIT NUMBER                              IDENTIFIED |
| 3 | Maddox Exhibit 63 - 6/15/17 Maddox expert |
| 4 | report in ▮Case No. 33▮'s case                302 |
| 5 | Maddox Exhibit 64 - medical record where the |
| 6 | date of visit is December 1, 2016            303 |
| 7 | Maddox Exhibit 65 - 3/20/18 Maddox deposition |
| 8 | in ▮Case No. 33▮'s case                       305 |
| 9 | Maddox Exhibit 66 - trial transcript from |
| 10 | ▮Case No. 33▮'s case dated October 11, 2018   311 |
| 11 | Maddox Exhibit 67 - medical records from |
| 12 | ▮Case No. 65▮                                 315 |
| 13 | Maddox Exhibit 68 - document Bates stamped |
| 14 | Maddox 2502                                   317 |
| 15 | Maddox Exhibit 69 - document Bates stamped |
| 16 | Maddox 00099222                               322 |
| 17 | Maddox Exhibit 70 - excerpt of a consult report |
| 18 | in ▮Case No. 7▮'s case                        324 |
| 19 | Maddox Exhibit 71 - document with "▮Case 68▮ |
| 20 | handwritten at the top, dated June 24, 2019   327 |
| 21 | Maddox Exhibit 72 - letter from Mount Sinai |
| 22 | Hospital sent to Ms. Kagan at Simon Greenstone |
| 23 | Panatier, signed by Dr. Moline                331 |
| 24 | |
| 25 | |

| | Page 12 |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | VIDEO OPERATOR: We are now on the record. |
| 3 | My name is Bradley Lloyd. I am a |
| 4 | videographer for Golkow Veritext Division. Today's |
| 5 | date is September 19, 2025. The time is 10:01. |
| 6 | This video deposition is being held in |
| 7 | Washington, D.C. in the matter of Pecos River Talc |
| 8 | LLC v. Dr. Theresa Swain Emory, et al., in the |
| 9 | United States District Court for the Eastern |
| 10 | District of Virginia, Newport News Division. |
| 11 | Will counsel please identify themselves. |
| 12 | MR. BUSH: Matthew Bush from Kirkland & |
| 13 | Ellis on behalf of Pecos River Talc LLC. And with |
| 14 | me is Jake Keester and Natalie Simmons, also from |
| 15 | Kirkland. |
| 16 | MS. LOCKWOOD: Liz Lockwood from Ali & |
| 17 | Lockwood on behalf of Defendants. |
| 18 | MS. PALMER: Meghan Palmer, Ali & |
| 19 | Lockwood, on behalf of Defendants. |
| 20 | VIDEO OPERATOR: Court reporter is Carmen |
| 21 | Smith and will now swear in the witness. |
| 22 | Whereupon, |
| 23 | JOHN C. MADDOX |
| 24 | was called as a witness and, having first been duly |
| 25 | sworn, was examined and testified as follows: |

| | Page 13 |
|---|---|
| 1 | EXAMINATION |
| 2 | BY MR. BUSH: |
| 3 | Q   Good morning, Dr. Maddox. I'll just |
| 4 | reintroduce myself for the record. My name is |
| 5 | Matthew Bush and I represent Pecos River here today. |
| 6 | How are you this morning? |
| 7 | A   Very good, Mr. Bush. Good to see you. |
| 8 | Q   You too, Dr. Maddox. What did you do to |
| 9 | prepare for your deposition? Without revealing the |
| 10 | contents of any conversations you had with your |
| 11 | attorneys. |
| 12 | A   Well, let me do this in reverse order. We |
| 13 | met for coffee at the nearby coffee shop this |
| 14 | morning a little after 8:00, talked for about a half |
| 15 | an hour and then came over here. |
| 16 | Yesterday we met at the Ali & Lockwood |
| 17 | office from about 12:00 noon until about 6:00 at |
| 18 | night. We reviewed -- |
| 19 | MS. LOCKWOOD: I'll instruct you that's -- |
| 20 | sorry, Dr. Maddox. I'll instruct you not to reveal |
| 21 | what we discussed. That's privileged. |
| 22 | THE WITNESS: Yes, ma'am. Yes, ma'am. |
| 23 | Over the last couple of weeks, I have |
| 24 | looked over some of the records that I've had just |
| 25 | to -- as a jog for my memory, to freshen my memory, |

Page 14

1  you might say.
2      BY MR. BUSH:
3    Q  Understood.  And other than the meetings
4  that you described, did you have any other meetings
5  with your attorneys in preparation for this
6  deposition?
7    A  Well, not in preparation for the
8  deposition.
9      However, you know, there's --
10     MS. LOCKWOOD:  Dr. Maddox, I'll just
11 remind you to not reveal the contents of our
12 communications.  I think that's probably responsive.
13 I just don't want to have an inadvertent disclosure.
14     BY MR. BUSH:
15   Q  I guess let me just ask you, Dr. Maddox, I
16 am not asking you to reveal any of the contents of
17 the communications with your counsel.  But is there
18 anything more you can say that you were going to say
19 in your answer with those restrictions in mind?
20   A  Technically, I don't think so.
21   Q  Okay.  Did you talk to Dr. Emory about
22 this deposition without your counsel present?
23   A  No, sir, I did not.  I have not spoken
24 with Dr. Emory in quite a while, months.
25   Q  And when was the last time you spoke to

Page 15

1  Dr. Kradin?
2      MS. LOCKWOOD:  Without counsel present?
3      BY MR. BUSH:
4    Q  Sure, without counsel present.
5    A  I really long time ago.
6    Q  So I take it --
7    A  Years possibly.  I'm a little conflicted
8  here because I'm trying to say that there have been
9  some group meetings on Zoom to discuss the course of
10 the litigation over the last several months.  And
11 the other doctors have been present at that as well.
12   Q  And were those Zoom meetings meetings
13 where your attorneys were present on the Zoom?
14   A  Yes.  And they were all privileged
15 communications.
16   Q  And have you talked to Dr. Cashman about
17 your deposition without counsel present?
18   A  No, I've never spoken to Dr. Cashman in my
19 life, as far as I know.
20   Q  Okay.  And I assume, then, you did not
21 talk to Dr. Kradin about his deposition without
22 counsel present?
23   A  I did not talk to Dr. Kradin about his
24 deposition at all.
25   Q  Okay.  Is anybody other than you,

Page 16

1  Dr. Kradin and Dr. Emory paying for your attorneys
2  in this case?
3      MS. LOCKWOOD:  And I'll just remind you,
4  Dr. Maddox, not to reveal the contents of any of our
5  privileged communications.
6      THE WITNESS:  I have no comment.
7      BY MR. BUSH:
8    Q  So you can't answer whether anyone is
9  paying for your attorneys other than Dr. Kradin, you
10 and Dr. Emory without revealing the contents of your
11 communications with attorneys?
12   A  I have been so instructed.
13   Q  Are you splitting the fees with your
14 attorneys evenly between you, Dr. Emory and
15 Dr. Kradin?
16     MS. LOCKWOOD:  Same instruction.
17     BY MR. BUSH:
18   Q  And you're not going to answer that
19 question based on your counsel's instruction?
20   A  I've been advised not to answer that
21 question.  And really, I don't know the answer to it
22 anyhow.  I don't know how that's been apportioned.
23   Q  When you are paying for your attorneys, is
24 the money you're sending less than one-third of the
25 amount of their fees?

Page 17

1      MS. LOCKWOOD:  Same instruction.
2      THE WITNESS:  Sorry, I've been instructed
3  not to answer.
4      BY MR. BUSH:
5    Q  Well, you know how much you're paying
6  without any conversations -- not relying on any
7  conversations you have with counsel.  I mean, you
8  know what checks or however the money is being
9  transferred.  You know what's leaving your bank
10 account; right?
11   A  That's right.
12   Q  So when the money is leaving your account
13 for paying your attorneys, is it less than one-third
14 of the fees that they charge?
15   A  I doubt it.  I mean, I don't know exactly
16 how it's been apportioned amongst the doctors,
17 particularly with Dr. Cashman entering the picture
18 as well.  But I know that I have had to write
19 several -- several checks.
20   Q  And when you write the checks, do you send
21 them directly to your attorneys or do you send them
22 to Dr. Kradin or Dr. Emory or anybody else?
23   A  I send directly to the attorneys.
24   Q  And do you know if any plaintiffs law firm
25 is agreeing to pay for your defense in this case?

Page 18

1    MS. LOCKWOOD:  Same instruction as
2 earlier.
3    THE WITNESS:  I've been instructed not to
4 answer, and I don't know the answer to that anyhow.
5    BY MR. BUSH:
6    Q    Okay.  Do you have any agreement among the
7 defendants in this case regarding allocating damages
8 or indemnification in the event that the defendants
9 are found liable?
10   A    I have no such agreement, written or
11 spoken, either one.
12   Q    Do you have any form of agreement with
13 anybody or any entity where someone other than you,
14 Dr. Emory or Dr. Kradin will pay any portion of the
15 damages assessed against you in the event that
16 you're found liable?
17   A    I have no written or verbal agreement to
18 that effect.
19   Q    And do you have any understanding of
20 whether -- without a formal or oral agreement, do
21 you have any expectation that that would happen?  Do
22 you have any expectation that there would be anybody
23 else that would be paying any of the damages in the
24 event that you were found liable even without any
25 sort of agreement?

Page 19

1    A    Maybe.
2    Q    And why do you say maybe?
3    A    Because I'm at the end of my career.  I'm
4 going into retirement.  The funds that I have are
5 retirement funds.  I'm not going to have a chance to
6 make much more in my life.  I'm 75 years old, and
7 I'm basically ready to move to a house in the woods.
8    Q    And I understand, Dr. Maddox.  I think my
9 question was a little different, which is do you
10 have any expectation that someone other than you or
11 your co-defendants would pay any or all of damages
12 that may be assessed against you in the event that
13 you're found liable?
14   A    I have no agreements, either written or
15 verbal, to that effect.
16   Q    But if you were found liable, do you have
17 any expectation that someone other than you or your
18 co-defendants would come in and pay for the damages
19 assessed against you?
20       MS. LOCKWOOD:  Objection; asked and
21 answered, third time.
22       THE WITNESS:  Well, I mean, I also have
23 expectations or hopes that I win the Powerball.  But
24 as far as written or verbal agreements with any
25 entity, no, I don't have any.

Page 20

1    BY MR. BUSH:
2    Q    You don't actually have an expectation
3 you're going to win the Powerball, though; correct?
4    A    Well, we can always hope.
5    Q    Right.  And hope is different from having
6 an expectation; right?
7    A    Yes, sir.
8    Q    Right.  And so putting aside what you hope
9 might happen, do you have any expectations that
10 someone other than you or your codefendants would
11 come and pay some portion or all of the damages
12 assessed against you in the event that you're found
13 liable?
14       MS. LOCKWOOD:  Objection.  This is the
15 fourth time you've asked this question.
16       MR. BUSH:  He didn't answer last time.
17       MS. LOCKWOOD:  Asked and answered.  He's
18 answered it again in a way that you don't
19 appreciate.  He's answered it in the way that he
20 believes he can answer the question.  He can answer
21 it one last time.
22       THE WITNESS:  Okay.  I -- I can hope that
23 if there was a bad outcome for me, that others would
24 help me.  But I have no written or verbal agreements
25 to that effect.

Page 21

1    BY MR. BUSH:
2    Q    Who are those others?
3    A    People with whom I've worked, other
4 doctors, other attorneys perhaps.
5    Q    And the other attorneys, does that include
6 attorneys from the Simon and Greenstone law firm?
7    A    Well, I have worked with attorneys at
8 Simon Greenstone, yes.  I don't know what the
9 outcome will be for them or with them or whether
10 they will contribute or not.
11   Q    Do you have any hope that they would be
12 among the others that would contribute to paying
13 some or all of the damages assessed against you in
14 the event that you are found liable?
15   A    I'm not sure how to answer that.  I mean,
16 I have no written or verbal agreement to that
17 effect.  But if it did happen, if the worst
18 happened, I hope that they would take notice and act
19 accordingly.
20   Q    And have you had any conversations with
21 any attorneys about Simon and Greenstone about
22 paying some or all of the damages assessed against
23 you in the event that you're found liable?
24   A    I've not had any conversation to that
25 effect.

Page 22

1   I have had conversations with attorneys at
2 Simon Greenstone Panatier over the last couple of
3 years limited to cases that were being worked on at
4 the time, not on the global issues that you've been
5 asking questions about.
6   Q   And do you think that it would be
7 appropriate for Simon and Greenstone to contribute
8 some or all of the damages assessed against you in
9 the event that you're found liable?
10   A   Well, there's two answers to that
11 question.  Number one, I have no formal opinion on
12 that.  Number two, it would be nice if they would.
13   Q   And do you think that it would -- are you
14 hoping that any other law firms other than Simon and
15 Greenstone -- strike that.
16       Do you have any hope or expectation that
17 law firms other than Simon and Greenstone would
18 contribute to pay some or all of the damages
19 assessed against you in the event that you're found
20 liable?
21   A   Well, again, there's two answers to that
22 question.  Hope, yes.  Expectation, neutral, no.
23   Q   And who would those other law firms be?
24   A   Well, I guess it would be other members of
25 the plaintiffs bar.  By plaintiffs bar, I'm talking

Page 23

1 about with reference to asbestos litigation.
2   Q   And because Simon and Greenstone -- strike
3 that.
4       You communicated with Simon and Greenstone
5 regarding your article over the course of its
6 preparation; correct?
7       MS. LOCKWOOD:  Objection; lack of
8 foundation.
9       THE WITNESS:  Well, yes and no.
10       I mean, there were a few cases where I
11 needed further information and I contacted people at
12 that firm to see if I could obtain further
13 information.  But there were no conversations about
14 reimbursements.
15       BY MR. BUSH:
16   Q   I understand.  Just putting reimbursements
17 aside for a minute, just over the course of your
18 preparation and drafting of the article, you had
19 communications with Simon and Greenstone regarding
20 your article; correct?
21       MS. LOCKWOOD:  Same objection.
22       THE WITNESS:  Well, individuals that were
23 in the -- in the article.  Not about the article
24 itself but about the history, the exposure history,
25 of people that either were or were not included in

Page 24

1 the article.
2       BY MR. BUSH:
3   Q   And they gave you some of the initial
4 subjects to put in the article from both cases where
5 you served as the pathologist and cases where others
6 served as the pathologist; correct?
7       MS. LOCKWOOD:  Objection; lack of
8 foundation.
9       THE WITNESS:  They sent me such cases for
10 review, that is correct.
11       BY MR. BUSH:
12   Q   And they sent you such cases with the
13 understanding that they were going to be subjects of
14 the article that you were drafting; correct?
15       MS. LOCKWOOD:  Objection; calls for
16 speculation, lack of foundation, misstates the
17 entire record in the case.
18       THE WITNESS:  Well, the understanding all
19 along was that I would be the one that selected
20 which patients would go in the article and which
21 would not, not -- they were not sending them to me
22 with an understanding that they would be in the
23 article.
24       BY MR. BUSH:
25   Q   But they were -- lawyers from Simon and

Page 25

1 Greenstone were sending you subjects with the
2 understanding that the reason they were sending them
3 to you was for you to determine whether to include
4 them as subjects in an article that you were
5 drafting, correct?
6       MS. LOCKWOOD:  Same set of objections.
7       THE WITNESS:  Well, I understood that the
8 articles that were sent to me were for the purposes
9 of seeking my opinions on the diagnosis and/or the
10 causation of the mesotheliomas in those patients,
11 for use in further litigation, which -- and which
12 was also permitted that I use them in a scholarly
13 article if I were to draft them.
14       BY MR. BUSH:
15   Q   And we can look at the e-mails in a
16 moment, but one of the things that happened was that
17 Simon and Greenstone sent you subjects for at least
18 potential inclusion in the article that were not --
19 that were plaintiffs in other cases where you were
20 not serving as their expert witness, but there were
21 other pathologists in the case; correct?
22   A   Well, yes, but it's not uncommon that
23 multiple pathologists will be consulted on
24 individual cases.
25       And the reasons for that are several.

Page 26

 1  There could be a disagreement on the diagnosis,
 2  there could be an inability to serve at a particular
 3  time so a stand-in would be needed.
 4      It could be that certain stains or
 5  procedures were not available from one pathologist,
 6  but they were available from another.
 7      So all of those various reasons.
 8   Q   And separate from that, Simon and
 9  Greenstone sent you cases for none of those purposes
10  but for the sole purpose for you to make a
11  determination whether to include them in the
12  article; correct?
13      MS. LOCKWOOD:  Objection; calls for
14  speculation, misstates the record.
15      THE WITNESS:  I don't see it that way.  I
16  don't think that that's true.
17      BY MR. BUSH:
18   Q   I'm going to mark -- and Simon and
19  Greenstone is a law firm that represents plaintiffs
20  in asbestos litigation; correct?
21   A   Yes, sir, that's right.
22   Q   And they have retained you as an expert
23  witness in numerous cases for -- where they're
24  representing plaintiffs in asbestos litigation;
25  correct?

Page 27

 1   A   That's correct.
 2      (Maddox Exhibit 1 identified.)
 3      BY MR. BUSH:
 4   Q   I'm going to mark as Exhibit 1 the article
 5  authored by Dr. Emory, Dr. Maddox and Dr. Kradin
 6  entitled "Malignant mesothelioma following repeated
 7  exposures to cosmetic talc: A case series of 75
 8  patients."
 9      And you are one of the three authors of
10  this article, along with Dr. Emory and Dr. Kradin;
11  correct, Dr. Maddox?
12   A   Correct.
13   Q   And did you review the final version of
14  this article before it was published?
15   A   Well, I think I did.
16   Q   And did you approve the article being
17  published?
18   A   Yes.
19   Q   How much did you need to pay the journal
20  in order to have this article published?
21   A   I don't know.  I'm not privy to the
22  conversation between Dr. Emory and the publishers on
23  that.
24      Now, this is an open access article so
25  that's what she would be -- what she would have

Page 28

 1  negotiated a payment for, was the open access, not
 2  for the publication of the article itself.
 3   Q   And that means -- can you just described
 4  what that means?
 5   A   Well, with many or most medical journals,
 6  not all, but with many medical journals, there is
 7  what's called a paywall.  In order to obtain a copy
 8  of the article, you have to pay a fee, anywhere from
 9  a few dollars to $100, in order to have the legal
10  permission to get a copy of the article to pull it
11  down from the Internet.
12   Q   So do you recall ever contributing any
13  money, for example reimbursing Dr. Emory or any
14  other way, that you paid some portion of a fee for
15  open access of the article?
16   A   I don't remember specifically.
17   Q   So that would be a question for Dr. Emory?
18   A   I can't answer it.  I don't know the
19  answer to that.
20   Q   And can we look at the abstract of your
21  article, Dr. Maddox, on the first page.
22   A   Yes, sir.
23   Q   I'm going to direct your attention to the
24  "Methods" section where the first sentence says,
25  "Seventy-five individuals (64 females; 11 males)

Page 29

 1  with malignant mesothelioma whose only known
 2  exposure to asbestos was repeated exposures to
 3  cosmetic talcum powders, were reviewed in
 4  medical-legal consultation."
 5      Do you see that?
 6   A   Yes, sir.
 7   Q   I'm not asking you what you knew at the
 8  time.  But sitting here today, you know that there
 9  are individuals in your article who, in fact, had
10  exposures to asbestos from non-talc sources;
11  correct?
12   A   Well, you know, I think that that
13  statement is mostly correct right now, that the only
14  significant exposures that the people in this study
15  had were to the cosmetic talcum powders.
16      Now, over time, there are some smaller
17  inaccuracies that have turned up.  But I think that
18  the significance of that group of patients is still
19  the same, that it's -- the big exposures that they
20  had were to talcum powder and the group of patients
21  that had this had more females than with the usual
22  industrial exposure pleural mesotheliomas.  There
23  were no peritoneal mesotheliomas, and there's some
24  interesting observations on the latency periods as
25  well.

Page 50

1 many subjects -- strike that.
2         Since your article was published, have you
3 made any efforts to determine how many subjects
4 overlap between the two articles?
5    A    The attorneys office has looked at that.
6 I'm afraid that I do not recall exactly what their
7 findings were on that.
8    Q    And I'd like -- if we could turn back to
9 Exhibit 1, which is your article, Dr. Maddox.
10   A    Yes, sir.
11   Q    I'd like to turn your attention back to
12 the methods section.
13   A    Yes, sir.
14   Q    Do you see where it says "Exposures were
15 identified through sworn deposition testimonies and
16 answers to sworn interrogatories provided from
17 subjects, parents, and spouses"?
18   A    Yes, sir.
19   Q    How would you describe the truth or
20 falsity of that statement?
21   A    Well, there is a variety of sources that
22 we looked at in order to determine what exposures a
23 patient had.  In some cases, it was quite simple
24 because there was a clear cut, well known,
25 definitive additional exposure, and we excluded

Page 51

1 those patients right away from the 75 patients that
2 we reported.  In other words, they became part of
3 the 65 instead of the 75.
4         Once we had excluded the 65, then we --
5 well, actually, it wasn't once we did.  All along we
6 were doing that.
7         But the ones we excluded, they were gone.
8 Then we went back to the ones that we wanted to
9 keep, and we dug deeper, looked through more stuff,
10 exposure history sheets provided by the attorneys
11 office, deposition transcripts or summaries, answers
12 to interrogatories, and in rare cases, conversation
13 with the patient themselves, such as with [Case
14 No. 24]
15   Q    You spoke to Mr. -- strike that, let me
16 ask you, you pronounce his name [Case No. 24]
17   A    Yes.
18   Q    You spoke to [Case No. 24] for purposes of
19 your article?
20   A    Well, I spoke with him in trial.  He came
21 to the trial in [Case No. 24].  I was there, and we
22 had 10 or 15 minutes to sit together and talk while
23 the lawyers were discussing something with the
24 judge.
25        A very interesting man.  I said to him,

Page 52

1 [Case No. 24], it says here that you were commissioner
2 of LAX.  What does that mean?  He looked me in the
3 eye and he said it means that I owned the place.
4 Basically, he was the head guy in charge.
5         So I said, well, [Case No. 24], do you have
6 any other asbestos exposures that resulted from your
7 job at that airport?
8         He said no.  We followed exposure
9 protocols, abatement protocols, things like that.
10 No.
11        I said, well, what about other places that
12 you worked?
13        And he says no, no, I never worked with
14 asbestos, and I have no other exposures that I know
15 of.
16        This is within the context of the bullet
17 points that we were talking about earlier.
18        So yeah, I mean, it's not my routine to go
19 interview a patient, but in this case, I was at the
20 trial and I had an opportunity to talk to him so I
21 did.
22   Q    And when you say you had an opportunity to
23 talk to him, did you just happen upon [Case No. 24] or
24 was this a prepared meeting?
25   A    It was not a prepared meeting.

Page 53

1         When I show up to testify at a trial, if
2 the patient is there, I will introduce myself and,
3 you know, I'll -- what am I trying to say here.  I
4 try to use some social interaction to make myself
5 known to them and wish them well.
6    Q    And so you formed your opinion regarding
7 [Case No. 24]'s exposures based on your 15-minute
8 conversation with him before trial?
9         MS. LOCKWOOD:  Objection; misstates the
10 record, mischaracterizes his testimony.
11        THE WITNESS:  No, sir.  I look at all the
12 evidence that's available to me to make a
13 determination of that sort.
14        So in his case, I've had opportunities to
15 look at deposition testimonies, I think
16 interrogatories and a personal conversation with the
17 man.
18        BY MR. BUSH:
19   Q    And when you say you review everything
20 available to you, generally, the way information or
21 evidence is available to you is because plaintiffs
22 attorneys provide it to you; correct?
23   A    That's generally true, yes, sir, that -- I
24 mean, that's -- you know, in the practice of
25 pathology, we're not private detectives, we don't go

Page 54

1 out and interrogate people or call people up on the
2 phone and ask them -- patients. We don't call them
3 up on the phone to ask them questions about this.
4      We take the information that we receive
5 and make our decisions off of that, that and the
6 pathologic material.
7      Now, I mean, if I -- well, off the
8 pathological material as well as the information
9 that we have received from the client.
10     BY MR. BUSH:
11  Q   All right. And sometimes to prepare your
12 reports, the only information you receive about a
13 plaintiff's exposure history is an exposure history
14 sheet prepared by the plaintiffs attorneys; fair?
15  A   In some cases, that's true.
16     And, in fact, if you were to look at the
17 65 people that had been excluded, you'd probably
18 find a fair number that that was sufficient to
19 persuade us that they shouldn't be in the study.
20  Q   And some of the people that are in the
21 study, the materials that you had for purposes of
22 preparing your report would have been only the
23 exposure history sheets that summarized the
24 exposures from the plaintiffs attorneys; correct?
25     MS. LOCKWOOD: Objection; misstates the

Page 55

1 record.
2     THE WITNESS: Well, I don't know.
3     Generally speaking, we would -- generally
4 speaking, we'd try to pursue cases a little further
5 than that.
6     BY MR. BUSH:
7  Q   But there are some cases where all you
8 had, your only information regarding a plaintiff's
9 exposure history, is the summary that the plaintiffs
10 attorneys provide you, correct?
11     MS. LOCKWOOD: Same objection, and object
12 to form.
13     THE WITNESS: Yeah, I can't answer that
14 request certainty.
15     BY MR. BUSH:
16  Q   Okay. And when you discuss what you
17 reviewed in your methods section, it doesn't state
18 that you reviewed concise statements from plaintiffs
19 attorneys, does it?
20  A   That specific answer is not amongst that
21 paragraph.
22  Q   And do you know whether -- do you know
23 sitting here today whether there were subjects of
24 your articles where you did not have their sworn
25 deposition testimonies or answers to sworn

Page 56

1 interrogatories but you nevertheless included them
2 among the 75 subjects of your article?
3  A   You know, I can't really answer that. You
4 know, as far as the vetting of patients that was
5 done by Dr. Kradin, I can't really speak to that
6 exactly. So I can't answer your question
7 specifically.
8  Q   For the cases that you submitted to the
9 article, sitting here today, do you know if there
10 were subjects among the 75 included in the article
11 where the only information that you had was exposure
12 history sheets from the plaintiffs attorneys and not
13 deposition testimonies or answers to
14 interrogatories?
15  A   I'd have to answer that I don't know.
16     MR. BUSH: We've been going -- it's 11:00
17 so we've been going about an hour. If you would
18 like a break, Dr. Maddox --
19     MS. LOCKWOOD: Sure, let's take a break.
20     VIDEO OPERATOR: Stand by. We are off the
21 record at 11:01.
22     (Recess.)
23     VIDEO OPERATOR: We are on the record at
24 11:15.
25     BY MR. BUSH:

Page 57

1  Q   Dr. Maddox, I want to talk to you a little
2 bit more about your process for reviewing the
3 materials to determine whether or not to include
4 somebody as a subject of your article.
5     (Maddox Exhibit 3 identified.)
6     BY MR. BUSH:
7  Q   I'm going to mark as Exhibit 3 "DEFENDANT
8 DR. JOHN MADDOX'S AMENDED RESPONSES AND OBJECTIONS
9 TO FIRST SET OF INTERROGATORIES AND RESPONSES AND
10 OBJECTIONS TO SECOND SET OF INTERROGATORIES SERVED
11 BY PLAINTIFF PECOS RIVER TALC LLC," dated April 14,
12 2025.
13  A   Thank you.
14  Q   Do you see, Dr. Maddox, that these are
15 your amended responses to certain interrogatories?
16  A   Yes.
17  Q   And you know from your work as an expert
18 witness that an interrogatory is a formal way that
19 one party can ask the other party questions that the
20 other side then responds to; correct?
21  A   Yes.
22  Q   And you rely on interrogatories sometimes
23 for purposes of preparing your expert reports;
24 correct?
25  A   Yes.

15 (Pages 54 - 57)

Page 102

1  Dr. Gordon, Dr. Abraham and Dr. Dodson?
2     A   Well, I had seen their work over several
3  years, particularly -- particularly Dr. Gordon and
4  Dr. Longo.  At one point Dr. Abraham and I talked
5  about doing some fiber counting together.  That was
6  back about 1990.
7         So I'm -- I had been aware of these fiber
8  counters for some time, and they had a good
9  reputation.  I mean, I did not try to look over
10 their shoulder on these individual cases, but I was
11 aware of their reputation as fiber counters at that
12 time.
13    Q   So for these cases that Ms. Kagan sends
14 you where someone other than you did the tissue
15 digestion analysis, you did not do anything to
16 specifically determine the accuracy of these
17 particular cases, but you relied on your
18 understanding of their reputation, of the
19 individuals doing the fiber analyses?
20        MS. LOCKWOOD:  Objection; mischaracterizes
21 testimony and misstates the record.
22        THE WITNESS:  As always, I looked at all
23 the evidence that was available to me.  If there was
24 information that they sent down on the methods,
25 materials and so forth of their fiber counts, I

Page 103

1  would have looked at it.
2         But as I sit here right now, I don't
3  remember exactly what that might have been.
4         Also, can I add that when other attorneys
5  like Patten, Wornom, Hatten & Diamonstein determined
6  that they wanted to get fiber counts, I would
7  recommend Dr. Gordon, because his method is slightly
8  different than the method used by other fiber
9  counters.
10        Other fiber counters use a filtration
11 method, but he uses an ashing and then
12 reconstitution, resuspension and serial dilutions,
13 so you avoid some of the artifacts that a filtration
14 method will create.
15        In other words, with a filtration method
16 you have holes in a filter that are so small --
17 well, that are big enough so that they don't stop
18 some of the fibers from going right through the
19 holes in the filter and being lost.
20        BY MR. BUSH:
21    Q   So you have an understanding of the work
22 of Dr. Gordon when he does his tissue analyses
23 generally?
24    A   Yes, yes.
25    Q   But when Ms. Kagan sent you these cases,

Page 104

1  you didn't go in and double-check to make sure --
2  the accuracy of his or anybody else's work other
3  than yourself for the tissue digestions you received
4  when somebody else performed them?
5         MS. LOCKWOOD:  Same objection as before.
6         THE WITNESS:  Yeah, I don't remember
7  exactly what was sent to me, but I certainly would
8  have considered everything that was sent to me.  If
9  he had sent methods and calculations and so forth, I
10 would have looked them over.  But I don't remember
11 whether he did or not.
12        MR. BUSH:  Let's mark as --
13        MS. LOCKWOOD:  Matt, is this an okay time
14 for a break?
15        MR. BUSH:  Of course.
16        MS. LOCKWOOD:  We've been going over an
17 hour.
18        VIDEO OPERATOR:  We are off the record at
19 12:23.
20        (Whereupon, at 12:23 p.m., the deposition
21 was recessed, to be reconvened at 1:00 p.m. this
22 same day.)
23
24
25

Page 105

1            AFTERNOON SESSION      (1:08 p.m.)
2  Whereupon,
3              JOHN C. MADDOX
4  resumed the stand and, having been previously duly
5  sworn, was examined and testified further as
6  follows:
7         VIDEO OPERATOR:  We are on the record at
8  13:08.
9            EXAMINATION (Continued)
10     BY MR. BUSH:
11    Q   Dr. Maddox, I forgot to ask you at the top
12 of the deposition, is there any reason you can't
13 give true and accurate testimony today?
14    A   Not that I'm aware of.
15    Q   If you could turn back to Exhibit 6, which
16 was the e-mail chain we were referring -- we were
17 discussing before the break, do you see that it was
18 on June 5, 2019, that you reported to Ms. Kagan that
19 Dr. Kradin seemed very interested in including other
20 brands beyond Cashmere Bouquet; right?
21    A   Yes.
22        (Maddox Exhibits 7 and 8 identified.)
23        BY MR. BUSH:
24    Q   I'm going to mark as Exhibit 7 an e-mail
25 chain between Dr. Maddox and Dr. Kradin dated June

27 (Pages 102 - 105)

Page 134

1   Q   And those names that have asterisks on
2   them, many of them are the ones that Ms. Kagan sent
3   to you on the first page of tissue digestions where
4   individuals other than you, Dr. Kradin or Dr. Emory
5   performed the tissue digestion analysis; correct?
6   A   Could you ask that question one more time,
7   please?
8   Q   The cases that Ms. Kagan sent you on
9   Exhibit 6 where somebody other than you, Dr. Kradin
10  or Dr. Emory performed the tissue digestion
11  analyses, many of those are among the subjects
12  listed on this spreadsheet with an asterisk where
13  the individual -- where somebody other than you,
14  Dr. Kradin or Dr. Emory is listed as the person
15  where the case is from; correct?
16       Let's do them one at a time, Case No. 65
17  which says UCLA Abrhms, that's a case that Ms. Kagan
18  sent you; correct?
19  A   Yes, yes.
20  Q   If we skip down to 69 which is
21  Abraham, that's a case that Ms. Kagan sent you;
22  correct?
23  A   Yes.
24  Q   And 70 is from Strauchen, a case that
25  Ms. Kagan sent you?

Page 135

1   A   Yes.
2   Q   Ms. Kagan.  And Case 71 which is from
3   Mayo NIH, same thing?
4   A   Yes.
5   Q   72 Zhang also from Ms. Kagan?
6   A   Yes.
7   Q   Case 74 Abraham also from Ms. Kagan?
8   A   Yes.
9   Q   For these cases where somebody else was
10  the -- where the case came from somebody other than
11  you or your coauthors, whose responsibility was it
12  to determine whether there were exposures to
13  asbestos from non-talc sources?
14  A   Well, again, all of us signed off on it.
15  I think that I probably would have reviewed them at
16  some time.
17  Q   And so it was your shared responsibility
18  among the three authors to review these cases that
19  came from individuals that weren't one of you three?
20  A   I think so.
21  Q   And do you actually remember reviewing any
22  of these cases to determine if there were exposures
23  to asbestos from non-talc sources?
24  A   I do not remember doing it six years ago.
25  Q   Okay.

Page 136

1   A   However, I think that there has been some
2   historical information that has been produced on
3   these cases.
4   Q   And you remembered your conversation with
5   Case No. 24 for 15 minutes before your trial
6   testimony; right?
7   A   I did.
8   Q   Do you remember if you were ever an expert
9   in Case 69 's case?
10  A   I'm sorry, I don't remember her name.
11  Q   And, in fact, you were not an expert in
12  Case No. 65 's case, Case 69 's case, Case 70 's
13  case, Case 71 s case, Case 72 s case, Case 74 s case
14  or any of those ones that I listed?  You were not an
15  expert in those cases; correct?
16       MS. LOCKWOOD:  Object to the form.
17       THE WITNESS:  I can't say.  I don't
18  remember.
19       BY MR. BUSH:
20  Q   And if you were -- if you did not have an
21  expert report in those cases, then how would you
22  have gone about determining whether they had
23  exposures to asbestos from non-talc sources?
24  A   From the information that I received from
25  the attorney when it was sent over.

Page 137

1   Q   Did you receive anything other than the
2   tissue digestion reports?
3   A   Again, I don't remember.  I'd have to have
4   the file to check it and tell you.
5   Q   But sitting here today, you don't know if
6   you received anything other than tissue digestion
7   reports for these cases where the -- that they came
8   from Ms. Kagan where neither you or your coauthors
9   are listed in the from column?
10  A   As I sit here today, I can't remember.
11  Q   If you could turn your attention back to
12  your article, please, Dr. Maddox.
13  A   Yes, sir.
14  Q   If you could look at the "METHODS"
15  section, which is section 2 on the second page.
16  A   Yes, sir.
17  Q   And the final version of the article
18  states "Exposures were identified through sworn
19  deposition testimonies and answers to sworn
20  interrogatories provided from subjects, parents, and
21  spouses."  Correct?
22  A   Yes, sir.
23  Q   I want to mark as Exhibit 22 an e-mail
24  from you to Dr. Emory with the Bates stamp 1675.
25       (Maddox Exhibit 22 identified.)

35 (Pages 134 - 137)

Page 138

1  BY MR. BUSH:
2  Q   Do you see where it says -- you write to
3  Dr. Emory in the last line of the top e-mail on
4  January 26, 2020, "Clinical info obtained from:
5  deposition review OR answers to interrogatories OR
6  concise statements of exposure received from
7  attorneys."
8      Do you see that?
9  A   I see that.
10 Q   And in your article, while it refers to
11 depositions and answers to interrogatories, it does
12 not refer to concise statements of exposure received
13 from attorneys as among the materials that you
14 reviewed in the process of preparing your article;
15 correct?
16 A   Correct.
17 Q   Why not?
18 A   Well, I don't know.  That's a question
19 you're going to have to ask Dr. Emory.  I would have
20 thought that the way I suggested was more
21 grammatically correct.  But perhaps she has a
22 different opinion.
23 Q   It's not just the grammatical correctness;
24 it's the correctness of the substance of what was
25 reviewed in order to determine the exposures or lack

Page 139

1  of exposures to asbestos from non-talc sources;
2  correct?
3      MS. LOCKWOOD:  Objection; mischaracterizes
4  the record.
5      THE WITNESS:  I think that goes way too
6  far.  I think it is, as I said, a grammatical
7  difference of opinion as to how that sentence.  Not
8  any change in the way things were done, just to
9  write the sentence.
10     BY MR. BUSH:
11 Q   It is true that as part of your process to
12 evaluate whether the individuals had exposures to
13 asbestos, part of what you relied on were concise
14 statements of exposure received from attorneys;
15 correct?
16 A   In some of the cases, that is correct.
17 Q   All right.  And that is not listed in your
18 article as what you reviewed; correct?
19 A   Well, I mean, it certainly would be true
20 that sometimes concise statements were received from
21 the attorneys, and that would influence whether it
22 was put in the category of 75 patients or the
23 excluded category of 65 patients.  But it was not
24 listed in the "METHODS" section.  Probably the --
25 well, one of the reasons could have included that

Page 140

1  that was generally a means of exclusion from the
2  article, if there was a known exposure that had been
3  cited in the concise statement from the attorney,
4  then that would be a reason for exclusion, wouldn't
5  it.
6      But again, that sentence was written by
7  Dr. Emory, and she would probably be more
8  appropriately the one to try to answer it than me.
9  Q   What your article says is that those
10 materials, the depositions and the interrogatories,
11 are what you reviewed to determine both whether to
12 include a subject or whether to exclude them;
13 correct?
14 A   Yes.
15 Q   Okay.  And it does not state anywhere in
16 the article, including the "METHODS" section, but
17 nor does it state anywhere else, that you reviewed
18 concise statements of exposure received from
19 attorneys as part of preparing your article;
20 correct?
21     MS. LOCKWOOD:  Objection; asked and
22 answered.
23     You can answer it again.
24     THE WITNESS:  Yeah, I don't really have
25 anything to add to what I previously told you.

Page 141

1  BY MR. BUSH:
2  Q   And is it still your testimony that it's a
3  grammatical difference whether the article states
4  that you reviewed concise statements of exposure
5  received from attorneys or not?
6  A   That's my speculation, yes, that it's a
7  grammatical error.
8  Q   What does a grammatical error mean to you?
9  A   The use or nonuse of the word "or."
10 Q   Can you explain how that is a -- how use
11 or nonuse of the word "or" has affected your article
12 in this circumstance?
13 A   Well, I don't think it has affected the
14 article at all.  The article was written the way
15 that we've explained already, and the writer of that
16 particular paragraph chose to express it the way
17 that she did.
18 Q   And you yourself relied on concise
19 statements of exposure received from attorneys;
20 correct?
21 A   Well, yes, I did.  Generally, those were
22 to aid in the exclusion of a case.  But I would
23 occasionally rely upon them.
24 Q   Okay.  And I want to mark as Exhibit 23 an
25 e-mail from Dr. Kradin dated February 9, 2020, which

Page 162

1    BY MR. BUSH:
2    Q    How is anyone supposed to know that?
3    A    I thought that the materials or the
4 methods section was explanation enough.
5    Q    And you know that this article is being
6 relied by other experts in cosmetic talc litigation;
7 right?
8    A    I don't know who is relying on it and who
9 is not.  But I would not be surprised if someone
10 were.
11    Q    And when you were preparing this article,
12 you expected that you would be relying on it in your
13 work as an expert in cosmetic talc litigation on
14 behalf of plaintiffs; right?
15    A    Well, I expected that I'd be retiring, but
16 I was trying to write a reliable article
17 nonetheless.  That it would be sort of like a
18 roadmap where I had been during the last 10 years
19 when I saw a number of talc cases.
20    Q    What do you mean by "a roadmap"?
21    A    Like a memoir, a guide to people who have
22 talc cases in the future, what to look for, what to
23 expect, the large number of female patients, the
24 predominance of peritoneal cases, the latency
25 periods, things like that, so that people could

Page 163

1 match up with new cases that they may have, similar
2 exposure group, to use the epidemiologist's term.
3    Q    And your article, if you could pull
4 Exhibit 1, on the top page, it states when it was
5 accepted for publication.  What's that date?
6    A    6 March 20120.
7    Q    So March 6, 2020 the article was accepted
8 for publication; correct?
9    A    Yes.
10    Q    And I assume you may not remember the
11 exact date, but shortly thereafter, it was in fact
12 published; correct?
13    A    Yes.
14       (Maddox Exhibit 29 identified.)
15       BY MR. BUSH:
16    Q    I'm going to mark as Exhibit 29 "RELIANCE
17 ARTICLES -- DR. JC MADDOX" dated April 30, 2020,
18 which is Bates number Maddox 2421.
19    A    Okay.  There was a typo when the article
20 first came out that was corrected very quickly
21 thereafter.
22    Q    There was a typo about the mean latency or
23 some mean usage, one of the means.
24    A    Yeah, one of the numbers wasn't right and
25 we had to straighten that out.  So --

Page 164

1    Q    But the article was published sometime
2 early in March 2020, even if you don't remember the
3 exact date?
4    A    Correct.
5    Q    So this is your -- what we're looking at
6 here as Exhibit 29 is your reliance list dated April
7 30, 2020; right?
8    A    Yes.
9    Q    And your reliance list is the list of
10 materials that you rely on in order to form your
11 opinions in the cases where you serve as an expert
12 witness; correct?
13    A    Yes.
14    Q    And this is a master reliance list, so it
15 applies to cases involving pretty much any kind of
16 product that you have ever been involved in or might
17 expect to be involved in; correct?
18    A    Yes.
19    Q    And do you see section 33 in the table of
20 contents is entitled "TALC"?
21    A    Yes.
22    Q    Right.  And so that section would have the
23 materials you're relying on for purposes of your
24 opinions in cosmetic talc cases; right?
25    A    Yes.

Page 165

1    Q    All right.  I would like to direct your
2 attention to page 72, please.
3    A    Yes.
4    Q    Do you see the last items in section 33 on
5 talc, the second-to-last item is your article with
6 Dr. Emory and Dr. Kradin entitled "Malignant
7 mesothelioma following repeated exposures to
8 cosmetic talc," which is at issue in this case that
9 we've been talking about?
10    A    Yes.
11    Q    So a month after your article came out,
12 you already added it to your list of reliance
13 materials for talc cases; right?
14    A    Yes.
15    Q    So are you really saying you weren't
16 expecting when preparing this article to be relying
17 on it in your capacity as an expert witness in
18 cosmetic talc litigation?
19    A    Well, initially I would.  But I still
20 really would like to completely retire.
21    Q    Understood.  But when you were preparing
22 your article, your expectation was that before your
23 retirement, while you were still serving as an
24 expert witness in talc cases, that you would be
25 relying on this article; correct?

Page 166

1  A  Well, my expectation was that it's the
2  proper thing to do to keep your reliance list up to
3  date, because whenever you give a deposition, you're
4  going to be asked for it.
5  Q  Right. So you were -- I apologize.
6  A  So if I present one that didn't have a
7  recently published article included on it, people
8  would say well, why didn't you do that so I avoided
9  that and just put it on the list.
10  Q  But the articles there isn't just sort of
11  any article that's recently published. They're
12  articles that you're planning to rely on for
13  purposes of your opinion in litigation; correct?
14  A  That's -- that's what that could be used
15  for, sure.
16  Q  Right. And so what this indicates is that
17  by April of 2020, you were relying on your article
18  for purposes of your -- of litigation in cosmetic
19  talc cases; correct?
20  A  Yes.
21  Q  And when you were preparing the article,
22  that's what you were expecting to happen after the
23  article was published, that you would be adding it
24  to your reliance list; correct?
25  A  Wait a minute. Are you a father?

Page 167

1  Q  Dr. Maddox --
2     MS. LOCKWOOD: Sorry, I don't think he
3  meant to be inappropriate, but let's just try to
4  stick to answering -- answering the question.
5     MR. BUSH: I didn't take it as
6  inappropriate, but I think that's a bad road to go
7  down.
8     THE WITNESS: The point that I'm trying to
9  make is, if you had a new baby, you'd probably take
10  a picture of it. Well, I had a new article and I
11  put it on my reliance list.
12     BY MR. BUSH:
13  Q  And that was what you expected to happen
14  when you were preparing the article, was that after
15  it was published, it would be added to your reliance
16  list, just like you take a picture of your new baby
17  after it's born?
18  A  Sure.
19  Q  Dr. Maddox, I'm going to mark as Exhibit
20  30 your -- it looks like -- we'll do this one
21  actually in a minute. It didn't print correctly.
22     (Maddox Exhibit 30 identified.)
23     BY MR. BUSH:
24  Q  I'm going to mark as Exhibit 30 where the
25  top e-mail is from Dr. Kradin to Dr. Maddox dated

Page 168

1  August 11, 2019, which is Maddox Bates number ending
2  3800.
3     Do you see in the first e-mail in the
4  chain on the bottom, Dr. Maddox, that you report to
5  Dr. Kradin that you "heard from Chris Panatier that
6  Longo, Gordon and Moline had just submitted their
7  paper regarding asbestos in talc. So, we may have
8  become moot"?
9     Do you see that?
10  A  I see that, yes.
11  Q  What did Chris Panatier tell you about the
12  article or articles regarding asbestos and talc that
13  had just been submitted?
14  A  I have no memory of it.
15  Q  Do you know if this refers to both
16  Dr. Moline and Dr. Gordon's article and also the
17  article coauthored by Dr. Longo where the first
18  author is Stefan?
19     MS. LOCKWOOD: Objection; lack of
20  foundation.
21     THE WITNESS: I am uncertain.
22     BY MR. BUSH:
23  Q  What do you think you meant by "we may
24  have become moot"?
25  A  Well, other people had already published

Page 169

1  on the subject, and their papers may therefore have
2  become the definitive papers on the subject.
3  Q  And would you have known at this time the
4  nature of the article written by Dr. Moline?
5  A  I don't think so. I don't think I had
6  seen the article at this point. Later I saw it, but
7  I mean, I don't think that I had seen it as of
8  August the 10th or August the 11th.
9  Q  Without seeing the article, how do you
10  know if the article you're preparing would have
11  something to contribute beyond Dr. Moline's article
12  or whether it would be duplicative of Dr. Moline's
13  article?
14  A  Well, since it was a controversial area,
15  since it was a relatively new area of publishing, I
16  think it would still be an appropriate article to
17  publish because it would -- it would broaden the
18  field, it would improve the statistics.
19  Q  But you were suggesting that -- even at
20  this time, you were suggesting that there may be
21  such a significant duplicativeness between your two
22  articles that the one you were preparing may have
23  become moot?
24     MS. LOCKWOOD: Objection; mischaracterizes
25  testimony.

Page 238

1 And if you would turn to a few pages in,
2 Dr. Maddox, do you see it states -- do you see the
3 caption has amended complaint? You have to turn to
4 about page 4 or 5 or so because it doesn't have page
5 numbers.
6   A   Amended complaint. I see amended
7 complaint.
8   Q   Okay. And if you turn to page -- the next
9 page, paragraph 1, do you see the section that
10 states "PARTIES"?
11   A   Yes, "PARTIES," paragraph 1.
12   Q   And this states, "Plaintiffs are citizens
13 and residents of the State of [Case No. 7].
14 [Case No. 7] was exposed to asbestos as a
15 bystander at a tractor mechanic shop, from take home
16 exposure."
17      Do you see that?
18   A   I see that.
19   Q   And considering that this wasn't listed in
20 your interrogatory response after your review of
21 your files, fair to say that you did not have this
22 amended complaint in your files at the time you were
23 preparing your article that's at issue in this case?
24   A   I'd say probably not.
25   Q   Do you think a complaint would be a good

Page 239

1 place to look as a starting point for determining
2 the potential exposures that might have arisen in
3 the course of a subject's case?
4   A   Well, I don't think it would be conclusive
5 evidence. I think it would be a reasonable starting
6 point, perhaps. But this is an allegation, not
7 evidence or proof.
8   Q   Did you ever review complaints when
9 preparing your article as part of the process of
10 determining whether a subject had exposures to
11 asbestos from a nontalc source?
12   A   If I had such a document, I probably would
13 have reviewed it. But I'm sort of disconnected from
14 any particular case.
15   Q   And the -- in your article when it talks
16 about the materials you reviewed, it states that you
17 reviewed sworn interrogatories and deposition
18 testimony; correct?
19   A   Yes.
20   Q   And it doesn't mention complaints?
21   A   Well, no. But in some cases there were
22 complaints in the file and I would have reviewed
23 them. But I don't remember how many. And again, I
24 don't consider that to be the most conclusive of
25 documents. It's an allegation, not evidence.

Page 240

1   Q   And you only would have reviewed
2 underlying material if on the face of your report
3 there was a question about what somebody's exposure
4 was; correct?
5      MS. LOCKWOOD: Objection; mischaracterizes
6 testimony.
7      THE WITNESS: I'm sorry, could you repeat
8 that, please?
9      BY MR. BUSH:
10   Q   You would only look at the underlying
11 materials in a case if on the face of your report
12 there was some ambiguity whether there was an
13 exposure to asbestos from nontalc -- a nontalc
14 source; correct?
15      MS. LOCKWOOD: Same objection.
16      THE WITNESS: Or not. Yes, I would look
17 at it.
18      I mean, if there was a known exposure, a
19 known significant exposure that was reported
20 primarily, then that case would automatically go to
21 the list of 65 rather than the list of 75.
22      BY MR. BUSH:
23   Q   And if on the face of your report, it
24 didn't mention anything about exposures to asbestos
25 from nontalc sources, not even a hint, that would go

Page 241

1 into the bucket of individuals that you included in
2 the article; correct?
3      MS. LOCKWOOD: Objection; mischaracterizes
4 testimony and the record.
5      THE WITNESS: If there was no record of
6 nontalc asbestos exposures, true exposures, then
7 either tentatively or permanently, that would go
8 into the list of 75.
9      And I say tentatively, because if
10 something turns up, some additional evidence turns
11 up that makes it clear that there was a significant
12 exposure to something else, then that would go in
13 the list of 65.
14      BY MR. BUSH:
15   Q   But if your report didn't mention anything
16 about other exposures, would anything have prompted
17 you -- strike that.
18      Do you remember a time where your report
19 doesn't mention any nontalc exposures and you
20 nevertheless went to look at underlying case
21 materials beyond your expert report?
22   A   Gosh, I probably have done that many
23 times, but I can't remember specific patient names
24 to tell you.
25   Q   Do you -- do you recall doing that when

Page 242

```
 1  preparing your article?
 2      A   Again, not a specific recollection of
 3  that, but I know that I have done that type of thing
 4  in the past, but I can't give you specific cases.
 5      Q   And when you talk about doing that type of
 6  thing in the past, that means in your work as an
 7  expert in litigation; correct?
 8          MS. LOCKWOOD:  Objection; mischaracterizes
 9  testimony.
10          THE WITNESS:  Well, I meant inclusively,
11  to include work as an expert in litigation, also
12  possibly on this case.  I can't remember the
13  specific -- excuse me, I should have said this
14  article.
15          I can't remember the specific case in this
16  article, but I may have done it.
17          BY MR. BUSH:
18      Q   And would anything have stopped you from
19  asking plaintiffs attorneys for the complaints in
20  any of the subjects' cases if you wanted to look at
21  them?
22      A   Nothing would have stopped me, but, again,
23  I -- as I tried to convey to you before, I put
24  complaints kind of low on the totem pole.  I would
25  rather see the deposition or the answers to
```

Page 243

```
 1  interrogatory in that case in order to substantiate
 2  the claim of a nontalc significant asbestos
 3  exposure.
 4      Q   What would you do if you didn't have the
 5  deposition testimony or an interrogatory response?
 6      A   I don't know what I'd do.  I would call up
 7  the attorney and ask them.
 8      Q   And how often -- when you called -- a few
 9  times you e-mailed attorneys at Simon and Greenstone
10  for more information; correct?
11      A   Yes.
12      Q   And sometimes they gave you a written
13  response to your question without providing you an
14  attachment or any evidence; correct?
15      A   Yes, on some occasions, that's true.
16      Q   And you took what the plaintiffs'
17  attorneys said at face value, right, without further
18  investigating any underlying evidence that would
19  support what they were stating?
20          MS. LOCKWOOD:  Objection; mischaracterizes
21  testimony and the record.
22          THE WITNESS:  If the -- if the response
23  was consistent with my belief in the case, then I
24  would accept that.
25          BY MR. BUSH:
```

Page 244

```
 1      Q   Do you remember [Case No. 38]'s case about
 2  popcorn ceilings?
 3      A   I remember that case.  That was -- she and
 4  her husband had a house they were going to put on
 5  the rental market, and it had a popcorn ceiling, and
 6  she and her husband using a wet method in one
 7  afternoon removed that ceiling.  The ceiling was
 8  never proven to have asbestos in it, and if they
 9  were concerned about it, I would assume that they
10  probably had worn a mask while they were doing that.
11          And I would not consider that to be a
12  significant nonasbestos -- excuse me, a significant
13  nontalc asbestos exposure.
14      Q   And [Case No. 38], you know, is an
15  individual who is in your article; correct?
16      A   Yes, in the 75.
17          (Exhibit 50 identified.)
18          BY MR. BUSH:
19      Q   I'm going to mark as Exhibit 50 your
20  expert report in [Case No. 38]'s case, which was dated
21  5/18/2017 for your electronic signature.
22      A   Yes.
23      Q   Do you see that in the clinical history
24  section you state "According to a progress note by
25  Dr. Lippman, during the 1970s and 80s, she lived in
```

Page 245

```
 1  a house with 'popcorn' ceilings, which might have
 2  had asbestos (or not)," do you see that?
 3      A   I see that.
 4      Q   Now, I'd like to -- one moment.
 5      A   Should I put some of these other papers
 6  up --
 7      Q   Yeah, why don't we keep your [Case No. 7]
 8  report and keep Exhibit 40 -- the one with the
 9  identities of the individuals would be helpful to
10  have, which I believe is Exhibit 45.
11      A   21?
12      Q   45 I think would be the most helpful to
13  keep around.
14      A   Keep 45, keep 49 because that's
15  [Case No. 7].
16      Q   Yeah, that's what we were just talking
17  about.
18      A   50 is [Case 38] who we were also just
19  talking about.  Should I put that one away?
20      Q   I apologize, I meant [Case 38] we're going
21  to be continuing to talk about [Case 38]  I got them
22  mixed up.
23      A   Okay.  So Jenkins is 50.
24      Q   Yes.
25      A   What about 49?
```

62 (Pages 242 - 245)

Page 338

1   A   I do not recall.
2   Q   Do you recall reviewing any Defense expert
3   exhibits at any point when preparing your article
4   that's at issue in this case?
5   A   I'm sorry, can you ask that again, please?
6   Q   Do you remember reviewing any Defense
7   expert reports when preparing your article that's at
8   issue in this case?
9   A   I don't recall.
10  Q   Don't you think if you're going to be
11  reviewing Plaintiff expert reports, you should also
12  be reviewing defense expert reports to get both
13  sides of the story?
14  A   Sometimes they're available, sometimes
15  not.
16  Q   And is there anything that would have
17  stopped you from asking the Plaintiffs' attorneys
18  for Defense expert reports in any of the subjects in
19  your cases?
20  A   Well, I can't say.  I mean, as a general
21  rule, I don't usually review defense expert reports.
22  But occasionally I do.
23      MS. LOCKWOOD:  Are we at time?  I think
24  we're at time.
25      VIDEO OPERATOR:  I wasn't keeping track,

Page 339

1   but yeah, sounds about right.
2       MS. LOCKWOOD:  I think we're at time.
3       MR. BUSH:  We don't even know.
4       MS. LOCKWOOD:  We can go off the record if
5   you want.
6       MR. BUSH:  I have like -- I'm going to
7   take 30 seconds and then we'll finish.
8       MS. LOCKWOOD:  Well, can we go off the
9   record to get the time?
10      MR. BUSH:  I understand.  Sorry, I didn't
11  understand what you were asking.
12      VIDEO OPERATOR:  We are at 7:02.
13      MR. BUSH:  Does that include just my
14  questioning?
15      VIDEO OPERATOR:  Yes, your questioning.
16      (Whereupon, at 7:55 p.m., the deposition
17  was concluded.)

Page 340

1   I HEREBY CERTIFY that I have read this
2   transcript of my deposition and that this transcript
3   accurately states the testimony given by me, with
4   the changes or corrections, if any, as noted.
5
6
7                           X
8
9
10
11  Subscribed and sworn to before me this     day of
12          , 20   .
13
14
15
16                          X
17                          Notary Public
18
19
20
21  My commission expires:                 .

Page 341

CERTIFICATE OF NOTARY PUBLIC & REPORTER

3   I, CARMEN SMITH, the officer before whom the
4   foregoing deposition was taken, do hereby certify
5   that the witness whose testimony appears in the
6   foregoing deposition was duly sworn; that the
7   testimony of said witness was taken in shorthand and
8   thereafter reduced to typewriting by me or under my
9   direction; that said deposition is a true record of
10  the testimony given by said witness; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this
13  deposition was taken; and, further, that I am not a
14  relative or employee of any attorney or counsel
15  employed by the parties hereto, nor financially or
16  otherwise interested in the outcome of this action.

                    CARMEN SMITH
                    Notary Public in and for the
                    District of Columbia

25  My Commission Expires:  MARCH 31, 2028